SUPERIOR FEDERAL BANK *v.* George MACKEY and
Jones & Mackey Construction Company, LLC

CA 02-1119 129 S.W.3d 324

Court of Appeals of Arkansas
Division IV
Opinion delivered November 19, 2003

[Petition for rehearing denied January 7, 2004.]

2

4

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.,* by: *Donald H. Henry, Lance R. Miller, John K. Baker,* and *Derrick W. Smith,* for appellant.

*David M. Hargis,* for appellees.

JOSEPHINE LINKER HART, Judge. This appeal arises from a lawsuit filed by appellees George Mackey and Jones & Mackey Construction Co., LLC, against appellant Superior Federal Bank for breach of contract, promissory estoppel, intentional interference with contractual relations, defamation, and punitive damages. Following a nine-day trial, the jury returned a verdict by interrogatories and awarded the following damages to the LLC: $411,000 for breach of contract, $210,000 for promissory estoppel, $175,000 for defamation, and $5,000,000 in punitive damages.[1] The trial court set aside the promissory-estoppel verdict and awarded the LLC postjudgment interest of 10% on the breach-of-contract count and 6.25% on the remaining counts.

---

[1] The jury found in favor of appellant on the intentional interference count and awarded no damages to George Mackey personally. Those findings are not at issue on appeal.

Appellant makes five arguments on appeal: 1) the trial court should have granted a directed verdict on the defamation count; 2) the trial court should have remitted the punitive-damage award; 3) the trial court should have granted a directed verdict on the breach-of-contract count; 4) the trial court erred in allowing jury members to question witnesses; 5) the trial court erred in instructing the jury on spoliation of evidence. The LLC makes two arguments on cross-appeal: 1) the trial court erred in awarding postjudgment interest at a rate of less than 10%; 2) the trial court erred in setting aside the promissory-estoppel award. On direct appeal, we affirm the compensatory damages for defamation, reverse the breach-of-contract award, and remand to the trial court for further consideration of the punitive-damage award. On cross-appeal, we affirm the award of postjudgment interest and reinstate the promissory-estoppel verdict.

### Background Facts

George Mackey is the sole owner of Jones & Mackey Construction Co., LLC. His background is in accounting and banking, and he is a former vice president of the Arkansas Development Finance Authority. Testimony at trial showed that, prior to the incidents that led to this lawsuit, Mackey enjoyed a stellar reputation. Witnesses testified that his credibility was without question and that he had been successful in his endeavors. In early 1998, Mackey decided to pursue a career in the construction business. While still with the ADFA, he joined forces with Mr. Robert Jones, who had twenty-five years of building experience, and together they completed several residential building projects.

In late 1998, Jones and Mackey began to do business in Faulkner County. They constructed a home in Conway, which was financed by a construction loan through First Community Bank. Shortly thereafter, Mackey received a phone call from Rick Baney, one of appellant's loan officers. Baney told Mackey that appellant was trying to establish a greater presence in the Conway lending market and would like an opportunity to finance Mackey's next project. As a result, in early 1999, appellant financed appellees' purchase of two residential lots for approximately $122,000 and financed construction of a home for $316,000. At about this same time, Mackey became sole owner of the LLC.

In early 1999, Mackey developed a plan to purchase a piece of property near the hospital in Conway and to construct a medical-office building. In April 1999, the LLC obtained a $270,000 loan from appellant to purchase the land Mackey had selected. Mackey then began to develop the property and incur expenses, including demolition of a building on the property, hiring an architect, and hiring a project manager. However, on May 10, 1999, the University of Central Arkansas, which owned property adjacent to the LLC parcel, filed a petition in Faulkner County Circuit Court to prevent all work on the property, pending negotiations for it to acquire the property through eminent domain. Mackey resisted UCA's petition and called upon appellant's representatives to attend the hearing and testify that the LLC had received financing for a viable project on the property. Steve Bryan and Rick Baney attended the hearing on behalf of appellant but were never called to testify. Following a May 17, 1999 hearing, the circuit judge denied UCA's petition.

The next day, May 18, 1999, Rick Baney sent a letter to George Mackey. The letter stated that it served as "a conditional commitment for approval of a $1,800,000 construction financing" and set forth several conditions that the LLC would have to meet to obtain the loan. As we will discuss in greater detail *infra*, the LLC contends that this letter created a contract whereby appellant promised to provide construction financing for the medical-office building. Upon receiving this letter, Mackey tendered his resignation to the ADFA and began work on the building. However, on June 7, 1999, Mackey received a fax from Rick Baney. The fax implied that the construction financing had not yet been approved, and it included several conditions that had not been set out in the May 18 letter.

In an attempt to settle the matter and obtain his funding, Mackey met with Tom Wetzel, appellant's regional manager of commercial loans. He and Wetzel clashed immediately, and their relationship deteriorated to the point of outright hostility. Wetzel ultimately sent Mackey the following letter on August 24, 1999, declining appellees' request for construction financing:

> Please be advised that as of this date Superior Federal Bank is declining the above referenced loan request for $1,600,000 [sic] due to lack of capital injection on your part. Current financial statements both personal and business indicate an inability to fund your portion of the cash required.

According to appellees, this letter from appellant refusing to finance the construction on the medical-office building constituted a breach of the May 18 commitment letter.

In addition to the construction financing controversy, which would become the basis for the LLC's breach-of-contract and promissory-estoppel claims, five incidents took place between June and October of 1999 that would become the basis for appellees' defamation claims. We will set these incidences out in greater detail later in the opinion, but they generally involved: 1) appellant returning a series of checks drawn on the LLC account marked insufficient funds; 2) appellant's representation to the Gospel Temple church, which had hired the LLC to construct a sanctuary, that the LLC was not on appellant's approved contractors list; 3) Wetzel's statement to a Mr. Frank Waite, an officer at another bank, that appellant was no longer doing business with Mr. Mackey; 4) Wetzel's statement to a Mr. Bernard Veasley, who was trying to help Mackey secure financing, that Mackey was "f***ing up"; 5) Wetzel's statement to Veasley that Mackey was a "big, fat slob" and a "big, black gorilla." When the construction financing on the medical office building fell through, the LLC began to lose money rapidly and was unable to pay its bills or continue construction on other projects. Ultimately, numerous lawsuits would be filed against the LLC, and the company would lose a great deal of money. Further, Mackey's and the LLC's once excellent reputations were eroded to the point that Mackey was referred to by one witness as a pariah.

On May 1, 2000, appellees sued appellant in Pulaski County Circuit Court, alleging that they had committed substantial resources to the medical-building project in reliance on appellant's commitment to provide financing and suffered considerable financial losses when appellant failed to follow through. They also alleged that they were defamed by appellant, which caused further damage to their reputations and business interests. During the course of the trial, appellant moved for a directed verdict on the defamation, breach-of-contract, and promissory-estoppel counts, all of which the trial court denied. Judgment was ultimately entered for the LLC on the defamation and contract counts, and appellant now appeals from that judgment.

## Defamation

■■ For its first argument on appeal, appellant contends that the trial court erred in failing to grant a directed verdict on the defamation count. In reviewing a denial of a motion for a directed verdict, our task is to determine whether the jury's verdict is supported by substantial evidence. *Tricou v. ACI Mgmt., Inc.*, 37 Ark. App. 51, 823 S.W.2d 924 (1992). Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *J.B. Hunt Transp. v. Doss*, 320 Ark. 660, 899 S.W.2d 464 (1995). When determining the sufficiency of the evidence, the appellate courts review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Coca-Cola Bottling Co. v. Gill*, 352 Ark. 240, 100 S.W.3d 715 (2003).

■■ The following elements must be proved to support a claim of defamation: (1) the defamatory nature of the statement of fact; (2) that statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; (6) damages. *Addington v. Wal-Mart Stores, Inc.*, 81 Ark. App. 441, 105 S.W.3d 369 (2003). A viable action for defamation turns on whether the communication or publication tends or is reasonably calculated to cause harm to another's reputation. *Id.*

Appellees' claims for defamation were based on the five statements previously mentioned. For the moment, we put aside the last two statements, which were made about Mr. Mackey personally, and focus on those that directly pertain to the LLC. First, we look to appellant's statement that the LLC was not on its approved-contractors list. The events leading up to the statement are as follows. On August 27, 1999, the Gospel Temple Baptist Church obtained a $300,000 loan from appellant to build a new sanctuary. The church had previously entered into a contract with the LLC to construct the sanctuary, and it paid the LLC a deposit of $133,000. Thereafter, Mr. Paul Woolfolk, who served on the church building committee, communicated with at least one and possibly two of appellant's officers. Steve Griffen, the manager of appellant's construction lending department, testified that the church called him asking for consideration of a loan request, and

when the church indicated that the LLC would be the contractor, Griffin checked the approved builders list and told the church that the LLC was not on it. Loan officer Steve Bryan testified that he spoke with Woolfolk when the church was preparing to enter the construction phase of its project. Bryan said that, when he learned that the church had given the building contract to the LLC, he told Woolfolk that appellant could not be involved in the project due to "a conflict of interest," allegedly referencing the troubles that were beginning to surface between Mackey and appellant over construction financing for the medical building. Woolfolk testified that Bryan told him that appellant would not finance the project if the LLC was the contractor and that the LLC was not on appellant's list of approved contractors. As a result, Woolfolk said, the church attempted to secure financing with another institution, Regions Bank. Regions approved a $280,000 loan, contingent on, among other things, the LLC furnishing a performance bond. When the LLC could not obtain a bond, the church canceled its contract with the LLC and asked for a refund of the $133,000.

 Appellant argues first that the statement that the LLC was not on the approved contractors list was true and that the truth of a statement is a complete defense to defamation. *See Wirges v. Brewer*, 239 Ark. 317, 389 S.W.2d 226 (1965). In our view, the truth of the statement was disputed because there was evidence that appellant did not actually maintain an approved contractors list. Although Steve Griffen testified as to the existence of the list, he could not produce a copy of it. Further, he testified in his deposition that there was no commercial contractors list, although there was a residential list. Rick Baney, appellant's loan officer, testified as follows:

> QUESTION: Insofar as you know today, as of August 1999, when you left the bank, there was no approved builders list existing at the bank?
>
> ANSWER: Not that I know of.
>
> QUESTION: So if somebody said that they can't do business with somebody because they're not on the approved builders list, that would be a false statement?
>
> ANSWER: As far as I know as of August of 1999.

Steve Bryan testified that he did not recall whether appellant had an approved contractors list. Finally, George Mackey, who had done business with appellant as a contractor, testified that he had never heard of an approved contractors list. Viewing this testimony in the light most favorable to appellees, we conclude that there was substantial evidence from which the jury could have found that the statement was false.

Appellant argues next that, even if the statement was false, the LLC did not prove that it sustained damages in connection with the statement. In order for liability for defamation to attach, there must be evidence that demonstrates a causal connection between defamatory statements made and the injury to reputation. *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999). A plaintiff must establish actual damage to his reputation, but the showing of harm may be slight. *Id.* A plaintiff must prove that the defamatory statements have been communicated to others and that the statements have affected those relations detrimentally. *Id.*

We believe there was substantial evidence that the LLC's relations with the Gospel Temple Church were detrimentally affected as the result of the statement. Paul Woolfolk testified that the church terminated the contract with the LLC in part because of appellant's statement. This caused the LLC to lose the money it would have made on the contract and to become liable for return of the $133,000. Further, it is clear that appellant's statement set in motion the series of events that led to the termination of the church's contract with the LLC. Had appellant not made the false statement, the LLC would not have been in the position of being required to meet the demands of another lending institution. Additionally, Steve Griffen testified in his deposition that customers often come to the bank for guidance regarding "who they are dealing with" and that a bank wants to make sure its customer is dealing with a reputable person. He responded affirmatively to counsel's question that the action of telling a customer that a builder was not on an approved list would imply that the person "was not of proper repute to do business with." Finally, although the church maintained the LLC as its contractor even after appellant made the statement about the list, there is evidence that the church did so because it had a contract with the LLC, not because it believed the LLC's reputation was untarnished. The combination of these factors leads us to conclude that there was

substantial evidence that the LLC sustained reputational damage as a result of appellant's statement. *See generally Northport Health Servs. v. Owens*, 82 Ark. App. 355, 107 S.W.3d 889 (2003).

For its final argument regarding this statement, appellant contends that the statement was privileged. A publication may be conditionally privileged if the circumstances induce a correct or reasonable belief that (1) there is information that affects a sufficiently important interest of the recipient or a third person; and (2) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct. *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002). However, the qualified privilege must be exercised in a reasonable manner and for a proper purpose. *Id*. The privilege may be lost if it is abused by excessive publication, if the statement is made with malice, or if the statement is made with a lack of grounds for belief in the truth of the statement. *Id*. The question of whether a particular statement falls outside the scope of the qualified privilege for one of these reasons is a question of fact for the jury. *Id*.

Appellant relies on *Pierce v. Bank One Franklin*, 618 N.E.2d 16 (Ind. Ct. App. 1993), and *West v. Peoples Bank & Trust Co.*, 14 Ohio App. 2d 69, 236 N.E.2d 679 (1967), for their holdings that a bank's defamatory statement to a third party may be privileged if the need exists for full and unrestricted communication on a subject in which both parties have a common interest or duty. We agree that, in many instances a bank must be free to impart information to its customers about third persons and that a bank may sometimes have a duty to do so. However, the bank may not exceed the scope of its privilege. Given the controversy in this case over whether an approved builders list actually existed, there is substantial evidence that appellant did not make the statement in good faith and lost any privilege it may have had by making the statement with a lack of grounds for belief in its truth.

Having determined that the jury's defamation verdict was supported by the above statement, it is not necessary that we analyze whether the verdict is supported by the remaining statements. The jury, in its answers to interrogatories, did not clearly indicate which statement or statements it found defamatory, only

that defamatory material was published and the LLC was damaged as a result. Thus, in the absence of a specific finding by the jury, we may affirm if any one statement served as substantial evidence of defamation. *See generally Elk Corp. of Ark. v. Jackson*, 291 Ark. 448, 725 S.W.2d 829 (1987) (affirming where the jury's verdict was supportable on any one of several theories presented). However, in the interest of providing a complete account of the events that occurred in this case, and because it may prove useful to the trial court's reconsideration of the punitive-damage issue, discussed *infra*, we will briefly address the other four statements that formed the basis of appellees' defamation claim.

The LLC also contended below that it was defamed by appellant returning some of its checks marked "NSF" (insufficient funds). George Mackey testified at trial that he had established a course of dealing with appellant concerning the LLC's checking account. He said that the LLC had a "controlled overdraft" account in which the bank would cover overdrafts up to a certain amount for a short period of time. Mackey testified that he was told not to let the overdraft amount on the LLC account exceed $25,000 to $40,000. Steve Griffen testified that, until November of 2001, the bank had a system whereby it could code certain accounts to permit short-term overdrafts of particular amounts, possibly up to $50,000, although he could not recall if the LLC had participated in that system. Appellant's officer Steve Park also confirmed the existence of such a practice.

In June of 1999, Mackey deposited a $65,000 check into the LLC account and immediately wrote $40,000 in checks thereon. As it happened, the $65,000 check was bad, and Mackey was notified of that fact. He very quickly deposited $40,000 to $50,000 to cover the checks the LLC had written. However, those checks were later returned marked NSF, and appellant accused Mackey of check kiting.

Appellant argues on appeal that the NSF designation cannot serve as a basis for a defamation action because the designation was true, *i.e.*, the LLC did not in fact have sufficient funds in its account to cover the checks it had written. Appellant relies on *Kiley v. First National Bank of Maryland*, 102 Md. App. 317, 649 A.2d 1145 (1994), in which the court held that a plaintiff's defamation action based on a bank's dishonor of a check must fail where plaintiff's funds were, in fact, insufficient to cover the checks.

■ The case before us has one important aspect that the *Kiley* case did not. Viewing the evidence in the light most favorable to appellees, there was a course of dealing between the LLC and appellant whereby appellant would cover any overdrafts for a short period of time.[2] It is possible that the jury, in light of the appellant's usual practice of accepting certain overdrafts as payable, could conclude that there were in actuality sufficient funds available to cover the LLC's checks when they were presented and that appellant's representation otherwise was false. Thus, there is substantial evidence to prove the element of falsity. However, the LLC presented virtually no evidence to establish that the NSF notation on the checks resulted in damage to the LLC's reputation. None of the payees of the checks testified, nor did anyone testify who had seen one of the checks. Therefore, despite our conviction that appellant's conduct in this instance was particularly egregious and seemingly calculated to do harm to the LLC by unexplainedly abandoning an established practice, we decline to hold that it supports the jury's defamation verdict.

The next statement was made by appellant's officer Tom Wetzel. Wetzel told Frank Waite of Regions Bank that appellant was no longer doing business with Mackey. This statement was made at the time Regions was considering the possibility of financing the Gospel Temple construction after appellant declined to do so. At some point, Wetzel told Waite that appellant wasn't "lending Mr. Mackey any more money" and that appellant was "no longer doing business with Mr. Mackey." On appeal, appellant argues that 1) the statement was true and 2) the LLC proved no reputational injury.

■ Appellant is correct that Wetzel's statement was true because it appears that the statement was made after appellant had declined the LLC's loan request. However, appellees contend that appellant told a half-truth and that the statement carried a derogatory implication that Mackey and the LLC were unfit to do business with. The concept of defamation by innuendo was considered in *Pritchard v. Times Southwest Broadcasting, Inc.*, 277 Ark. 458, 642 S.W.2d 877 (1982), where the court said, "The words to

---

[2] We note, as a matter of interest, that the Uniform Commercial Code provides that a bank may dishonor an item that would create an overdraft unless it has agreed to pay the overdraft. *See* Ark. Code Ann. § 4-4-402(a) (Repl. 2001).

be defamatory in such cases should be susceptible of two meanings, one defamatory and one harmless. In that regard, we read the words in their plain and natural meaning, as they would be interpreted by a reader of the newspaper considering the articles as a whole." *Id.* at 461, 642 S.W.2d at 878. The court also said that it would not strain to find a defamatory meaning in such instances. *Id.*

 We believe that there is substantial evidence from which the jury could have found that the statement was damning enough to contain a defamatory implication. The statement was incomplete because it tended to imply that appellees were unworthy to loan money to when in fact appellant and appellees broke off relations over the construction-financing conflict. Further, the jury was not required to view the statement in a vacuum. In determining whether the statement carried a defamatory meaning or a harmless meaning, the jury could consider the fact that Tom Wetzel made other disparaging statements about appellees as well, which will be detailed shortly. However, as in the case of the insufficient-funds checks, appellees did not provide evidence to show that the communication of this statement to Frank Waite caused reputational damage. Waite testified that he had no problem with the LLC being the contractor on the Gospel Temple Construction. Therefore, we decline to uphold the jury's verdict on the basis of this statement.

Finally, we come to the two statements that Tom Wetzel made about George Mackey. These statements were made by Wetzel to Bernard Veasley, who was attempting to intercede with appellant and help Mackey obtain permanent financing for the medical building project. At Mackey's request, Veasley went to see Wetzel to assure him that he had a "take-out" lender who was prepared to take out the construction loan. When he arrived to see Wetzel, he overheard a phone conversation between Wetzel and Mackey on the speaker phone in which they were arguing over financing. Later, Wetzel told Veasey that Mackey was a "big, fat, damn slob" who was "f***ing up." Wetzel also called Mackey "a big, black gorilla."

There is no doubt that these statements are defamatory in nature. They carry a meaning that Mackey was incompetent in running his business and did not possess the human mental wherewithal to do so. Further, actual reputational damage was

caused. Veasely testified that he would no longer do business with Mackey after hearing that he was "messing up." However, appellant argues that these statements reference Mackey personally and so cannot be used to support a defamation verdict in favor of the LLC. We have found no Arkansas case on point and the parties have cited none, regarding whether a company may be defamed by statements made about one of its officers. Because we have already determined that the jury's defamation verdict is supported by substantial evidence, we decline to break new ground on this issue.[3] However, we take this opportunity to express our revulsion toward such malicious and hateful language uttered by a bank about its customer.

To conclude on this point, we affirm the trial court's decision to deny a directed verdict on the LLC's defamation claim and affirm the $175,000 verdict.

### Punitive Damages

Appellant's argument on this point is twofold. First, it argues that there was not substantial evidence to support punitive damages. Second, it argues that the punitive–damage award was excessive.

Appellant is procedurally barred from raising the first argument. Appellant made no directed-verdict motion to dismiss appellees' claim for punitive damages, nor did it object to the jury being instructed on punitive damages. The first objection appeared in appellant's posttrial motion. In *Willis v. Elledge*, 242 Ark. 305, 308-09, 413 S.W.2d 636, 638 (1967), our supreme court stated:

> Appellant first argues that there was not enough evidence to submit the issue of punitive damages to the jury, but we cannot consider this question, since an instruction on punitive damages was given the jury without objection on the part of appellant. The failure to

---

[3] *But see Dombey v. Phoenix Newspapers, Inc.,* 150 Ariz. 476, 724 P.2d 562 (1986), which recognized that a corporation is not defamed by communications defamatory of its officers, agents, or stockholders unless the communications also reflect discredit upon the method by which the corporation conducts its business. The court also recognized that libel of an individual can cause injury to a corporation if they are so interconnected that a reasonable person would perceive harm to one as harm to another.

object to an instruction operates as a waiver of any error that might be committed in giving it.

The supreme court has also recently held that an appellant waives its right to question the sufficiency of the evidence to support a punitive-damage award if it does not make the proper directed-verdict motions. *Advocat, Inc. v. Sauer*, 353 Ark. 29, 49, 111 S.W.3d 346, 357 (2003):

> Appellants' first argument that there was insufficient evidence to support the award of punitive damages in this case is not preserved for this court's review. Arkansas Rule of Civil Procedure 50(e) requires that where "there has been a trial by jury, the failure of a party to move for a directed verdict at the conclusion of all the evidence, because of insufficiency of the evidence will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the jury verdict."
>
> . . . .
>
> Because the appellants failed to renew their motion for directed verdict following the conclusion of the Sauer Estate's rebuttal, they waived any question pertaining to the sufficiency of the evidence to support the jury's award of punitive damages.

In the case at bar, appellant made no directed-verdict motion regarding punitive damages. Further, appellant permitted the jury to be instructed on punitive damages without objection. Appellant's failure to preserve the issue at one of these stages precludes appellant from now raising the issue on appeal.

However, the same does not hold true for appellant's argument that the punitive-damage award was excessive, even though that argument was also made for the first time in a posttrial motion. Obviously, a party is unaware of the excessive nature of a verdict until that verdict is rendered. We therefore consider the merits of this argument.

Ordinarily, we follow a two-step analysis in determining whether a punitive-damage award is excessive. First, we determine whether the award is excessive under state law. That entails an analysis of whether the jury's verdict is so great as to shock the conscience of the court. *See Advocat, supra.* It also entails

a consideration of the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. *Hudson v. Cook*, 82 Ark. App. 246, 105 S.W.3d 821 (2003). Second, we consider the award in light of the federal due process analysis in *BMW of North America v. Gore*, 517 U.S. 559 (1996). This involves an analysis of the degree of the defendant's reprehensibility or culpability; the relationship between the penalty and the harm; and the sanctions imposed in other cases for comparable misconduct. *Hudson v. Cook, supra.* The United States Supreme Court recently elaborated on the factors to be considered when assessing the degree of a defendant's reprehensibility: whether the harm caused was physical as opposed to economic; whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; whether the target of the conduct had financial vulnerability; whether the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). The Court in that case also recognized that, in practice, few awards exceeding a single-digit ratio between compensatory and punitive damages will satisfy due process.

 The *Campbell* case was handed down by the Supreme Court on April 7, 2003, while this appeal was pending. Thus, the trial court did not have the opportunity to consider it. It is apparent that the punitive-damage award in this case, which bears a 28.5-to-1 ratio to the compensatory award, should be reexamined in light of *Campbell*. While we recognize that we have the authority to conduct a *de novo* review of the punitive award, *see Advocat, supra,* we believe the better approach in this case is to remand the case to the trial court to reevaluate the award in light of the factors considered in the Supreme Court's recent holding in *Campbell*. We therefore remand for that purpose.

### Breach of Contract

The LLC's breach-of-contract claim was based on the letter that Mackey received from appellant on May 18. The letter reads:

> Thank you for allowing Superior Federal Bank to participate in your medical building project at Western and College in Conway, AR. We have approved an interim loan in the amount of $272,000

for the land acquisition for this project. This will serve as a conditional commitment for approval of a $1,800,000 construction financing. Before final construction financing can be approved, the following items are needed:

— Loan value not to exceed 80% of the lower of cost or appraisal

— 3-year projections accompanied by signed lease commitments of 60% - 75%

—Tax returns on each principal of Jones & Mackey Construction Company, LLC

Appellant argues that the May 18 letter was not an enforceable contract because the parties did not agree on all essential terms. Therefore, appellant contends, the trial court should have granted a directed verdict on the breach-of-contract claim. We agree.

It is well settled that where all essential terms of a contract are not agreed upon, the contract is unenforceable. *Troutman Oil Co. v. Lone*, 75 Ark. App. 346, 57 S.W.3d 240 (2001); *Hunt v. McIlroy Bank & Trust Co.*, 2 Ark. App. 87, 616 S.W.2d 759 (1981). The *Hunt* case involved a situation that is somewhat similar to the case at bar. There, the Hunts alleged that McIlroy had orally promised to loan them an unspecified amount of money between $500,000 and $750,000. The alleged oral agreement contained no interest rate or repayment terms. The trial court held that no contract was created, and the supreme court agreed:

After a study of the evidence presented at trial, we have no hesitancy in agreeing with the chancellor that the appellants failed to prove a contract existed between themselves and the appellee. Appellee's officer, Larkin, and appellant Ben Hunt initially discussed the financing of the expansion of the S.B.H. Farm operation, but the total amount of loan proceeds was never decided. Hunt said that at one time Larkin told him he could have up to $750,000. Larkin testified that the appellee was willing to loan in excess of $500,000, and it could have been $700,000. Both Larkin and Hunt agreed that no interest rate or repayment terms were ever agreed upon. There apparently was some discussion that long term permanent financing would be necessary, but the terms of such financing were left to future determination. Meanwhile, short term notes were signed by

appellants for loan proceeds so the farm expansion could commence. Although Larkin and Hunt may have generally agreed on a course of action as to the need for financing the farm project, they never agreed on the essential, much less all of, the terms of a contract to loan monies. There is no way that a court could take the general terms discussed between Larkin and Hunt regarding an open-ended loan with no repayment provisions and be asked to enforce an agreement without filling in necessary terms essential to the formation of a contract. The subject matter of the proposed agreement was indefinite and the mutual assent and obligations were so vague as to be unenforceable.

*Id.* at 90, 616 S.W.2d at 761. Likewise, in the case at bar, a court could not enforce such an agreement without adding certain essential terms. Although the May 18 letter contains the amount of the loan, it does not contain a repayment schedule, a term of the loan, or an interest rate. These are essential terms of a loan commitment letter. Black's Law Dictionary defines a loan commitment as a:

> Commitment to borrower by lending institution that it will loan a specific amount at a certain rate on a particular piece of real estate. Such commitment is limited to a specified time period (e.g. four months), which is commonly based on the estimated time that it will take the borrower to construct or purchase the home contemplated by the loan.

*Black's Law Dictionary* at 844 (5th ed. 1986).

Appellees argue that testimony was presented at trial by several persons familiar with construction lending practices, and all of them testified that the May 18 letter was a "commitment letter" upon which a borrower could rely to begin his project. While such testimony may be relevant to the LLC's promissory-estoppel claim, discussed *infra*, it does not alter the fact that the letter does not contain the essential terms to establish a formal contract. Appellees also argue that there was evidence from which the term of the loan and the interest rate could be established by custom or usage. For example, there was testimony that the term of a construction loan would typically be the period of construction, which could vary, and that a standard range of short-term interest rates were available on construction loans. However, there was no evidence that a specific term or rate of interest was customary, nor was there any evidence that the parties reached an agreement as to

any rates or loan terms. There was also evidence that Mackey had prepared amortization schedules using specific interest rates and terms. However, these schedules were prepared during the negotiating process. There is nothing to show that, following negotiations, the parties ultimately agreed to any particular term or interest rate. In any event, the two amortization schedules referenced by appellees show different loan amounts, different interest rates, and different repayment schedules.

 Given the absence of essential terms, we hold that the May 18 letter does not constitute an enforceable contract. We also agree with appellant's argument that the May 18 letter lacks the mutuality required of a contract because it imposed no obligation on the LLC:

> A contract to be enforceable must impose mutual obligations on both of the parties thereto. The contract is based upon the mutual promises made by the parties; and if the promise made by either does not by its terms fix a real liability upon one party, then such promise does not form a consideration for the promise of the other party. ... "Mutuality of contract means that an obligation must rest on each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound." A contract, therefore, which leaves it entirely optional with one of the parties as to whether or not he will perform his promise would not be binding on the other.

*Showmethemoney Check Cashers v. Williams*, 342 Ark. 112, 120, 27 S.W.3d 361, 366 (2000) (quoting *Townsend v. Standard Indus., Inc.*, 235 Ark. 951, 363 S.W.2d 535 (1962)). In the case at bar, the LLC could have walked away from appellant and obtained financing at another institution, and appellant would have had no right to enforce any obligation. Thus, there was no mutuality of obligation. *See also Armstrong Business Servs. v. AmSouth Bank*, 817 So.2d 665 (Ala. 2001) (holding that where there was no showing that the prospective borrower gave or did anything for the benefit of the prospective lender, there was no consideration for the loan commitment).

For the reasons stated, we reverse the jury's breach-of-contract verdict of $411,000.

## Juror Questioning of Witnesses

Throughout the trial, the judge invited jurors to ask questions of the witnesses and the jurors did so on numerous occasions. The procedure was that the jurors would submit written questions to the judge, who would preview the questions and pose them to the witnesses. Appellant contends on appeal that such questioning by jurors should be prohibited because it removes the jury from its position as fact-finder and improperly places it in an adversarial role. *See, e.g., Wharton v. State*, 734 So.2d 985 (Miss. 1998); *State v. Zima*, 237 Neb. 952, 468 N.W.2d 377 (1991); *Morrison v. State*, 845 S.W.2d 882 (Tex. Ct. App. 1992).

We first address appellees' contention that appellant has waived this argument by failing to object. We disagree. From the first time that a juror actually proposed a question, appellant objected and continued to object to the practice throughout the trial.

As for the merits, we note that the supreme court has approved the practice of juror questioning. *Nelson v. State*, 257 Ark. 1, 513 S.W.2d 496 (1974); *Ratton v. Busby*, 230 Ark. 667, 326 S.W.2d 889 (1959). Appellant urges this court to join those jurisdictions that ban juror questioning. However, we are without authority to overrule decisions made by the supreme court. *Dean v. Colonia Underwriters Ins. Co.*, 52 Ark. App. 91, 915 S.W.2d 728 (1996). Therefore, we affirm on this issue.[4]

## Instructing the Jury on Spoliation of Evidence

Appellant's final argument is that the trial court erred in instructing the jury on spoliation of evidence. The jury was instructed as follows:

> If you find that a party intentionally destroyed, lost or suppressed documents in this case with the knowledge that their contents may be material to a pending claim, you may draw the inference that the content of the documents would be unfavorable to that party's defense. When I use the term "material" I mean evidence that could be a substantial factor in evaluating the merit of the claim in this case.

---

[4] Certification was attempted on this point and rejected by the supreme court.

Spoliation is the intentional destruction of evidence; when it is established, the fact-finder may draw an inference that the evidence destroyed was unfavorable to the party responsible for its spoliation. *Tomlin v. Wal-Mart Stores, Inc.*, 81 Ark. App. 198, 100 S.W.3d 57 (2003). An aggrieved party can request that a jury be instructed to draw a negative inference against the spoliator. *Id.*

 A party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in the evidence to support the giving of the instruction. *Id.* We believe there is sufficient evidence in this case to support the giving of an instruction on spoliation. During the course of trial, appellees questioned appellant about the whereabouts of the 1999 approved contractors list, personnel evaluations of Tom Wetzel, and loan committee minutes that would have referenced the initial land-acquisition loan. Although there was testimony that these items should have existed, none could be found and no credible explanation was given for their absence. We therefore hold that the trial court did not err in giving this instruction.

### Cross-Appeal: Postjudgment Interest

 The trial court imposed postjudgment interest at a rate of 6.25% on the noncontract damages. Appellees argue that, under Ark. Code Ann. § 16-65-114(a) (1987), a court must impose a 10% rate for postjudgment interest. That statute reads:

> Interest on any judgment entered by any court or magistrate on any contract shall bear interest at the rate provided by the contract or ten percent (10%) per annum, whichever is greater, and on any other judgment at ten percent (10%) per annum, but not more than the maximum rate permitted by the Arkansas Constitution, Article 19, Section 13, as amended.

The clear language of this statute is that, in the case of damages that are not awarded on a contract judgment, the court may award postjudgment interest of 10%, but not if 10% exceeds the maximum rate permitted by the Arkansas Constitution. The recent supreme court case of *Bank of America v. C.D. Smith Motor Co.*, 353 Ark. 228, 106 S.W.3d 425 (2003), clearly indicates that postjudgment interest in excess of the rate permitted by the Arkansas Constitution is prohibited. There is no evidence in the record before us as to what interest

rate the constitution would have permitted on the date that judgment was entered. However, it is not necessary that we have that information because appellees argue only that the trial court was required to award 10% interest. Based on the language of the statute and the recent supreme court holding, we reject that argument because 10% postjudgment interest is not awardable if it exceeds the amount allowed by the constitution.

## Promissory Estoppel

The trial judge set aside the jury's $210,000 promissory-estoppel verdict because he determined it was incompatible with the jury's finding that a breach of contract had occurred. It is correct that promissory estoppel is a basis for recovery when formal contractual elements do not exist. *MDH Builders v. Nabholz*, 70 Ark. App. 284, 17 S.W.3d 97 (2000). However, our reversal of the breach-of-contract award renders that rationale moot and thus permits reinstatement of the promissory-estoppel verdict.

Appellant argues that, even if the promissory-estoppel verdict is reinstated, there was not sufficient evidence to support it. We disagree. According to *Kearney v. Shelter Insurance Co.*, 71 Ark. App. 302, 307-08, 29 S.W.3d 747, 750 (2000), the black-letter law on promissory estoppel is found in the *Restatement (Second) of Contracts*, § 90:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Whether there has been actual reliance and whether it was reasonable is a question for the trier of fact. *Kearney, supra.*

In the case at bar, Mackey testified that appellant orally promised to finance the construction of the medical-office building and, as a result, he incurred over $500,000 in expenses. The loan memorandum for the land purchase indicates that appellant expected to obtain repayment from lease proceeds of the medical-office building, which could indicate that appellant contemplated providing financing through the construction phase. There was also evidence that appellant may have seen a sign

in front of the building site which read that it was providing financing for the project, yet it did not remove or object to the sign. Finally, there was testimony from numerous witnesses that it was reasonable for a borrower to rely on a commitment letter such as the May 18 letter to incur expenses and begin preparation for construction. In light of this evidence, we uphold the jury's $210,000 verdict for promissory estoppel.

### Appellees' Motions

Pending before us are appellees' motion to strike appellant's reply brief and motion for sanctions and costs in connection with alleged deficiencies in appellant's abstract and addendum. We deny the motions, except that we award appellees $500 for supplementation of the addendum, pursuant to Ark. R. Sup. Ct. 4-2(b)(1) (2003).

Affirmed in part, reversed in part, and remanded in part on direct appeal; affirmed in part and reversed in part on cross-appeal.

STROUD, C.J., and VAUGHT, J., agree.