SUPERIOR FEDERAL BANK *v.*
JONES & MACKEY CONSTRUCTION COMPANY, L.L.C.,
and George Mackey

CA 04-1389 219 S.W.3d 643

Court of Appeals of Arkansas
Opinion delivered December 7, 2005

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Donald H. Henry, Lance R. Miller, John K. Baker*, and *Derrick W. Smith*, for appellant.

*David M. Hargis*, for appellees.

JOSEPHINE LINKER HART, Judge. In this case, we are asked to determine whether a $3.08 million punitive-damage award imposed by the trial court meets the due-process requirements of the United States Constitution. We are also asked, on cross-appeal, to reinstate the jury's original $5 million punitive-damage verdict. Based on our de novo review, we believe that the trial court properly applied the due-process considerations in awarding $3.08 million, and we therefore affirm on direct and cross-appeal.

## Direct Appeal

This is the second time that this case has come before us. The first appeal was brought following a jury trial in which damages were awarded against appellant Superior Federal Bank and in favor of appellee Jones and Mackey Construction Company, LLC (hereafter, the LLC), as follows: $411,000 for breach of contract; $210,000 for promissory estoppel (which the trial judge set aside); $175,000 for defamation; and $5,000,000 in punitive damages. In *Superior Federal*

*Bank v. Mackey*, 84 Ark. App. 1, 129 S.W.3d 324 (2003) (*Mackey I*), this court reversed the breach-of-contract award, reinstated the promissory-estoppel award, and affirmed the defamation award, with the net result being that the LLC's compensatory verdict was reduced from $796,000 to $385,000. As for the punitive damages, we remanded that award to allow the trial judge to review it in light of the considerations expressed by the United States Supreme Court in *State Farm Mutual Insurance Co. v. Campbell*, 538 U.S. 408 (2003), which was decided while the appeal was pending. Upon remand, the trial judge reduced the punitive award to $3.08 million. Appellant Superior Federal now appeals and argues that the punitive damages, even as reduced, remain excessive. Our review of this argument will be undertaken de novo. *See Union Pac. R.R. v. Barber*, 356 Ark. 268, 149 S.W.3d 325 (2004).

The pertinent facts are contained in *Mackey I*, but we believe it is helpful to reiterate at least some of those facts here and add others for the purpose of explaining our affirmance of the punitive award. The LLC is a construction company owned by Mr. George Mackey. Although Mackey has a background in accounting and banking and is the former vice-president of the Arkansas Development Finance Authority, he decided in 1998, while he was still with the ADFA, to join forces with an experienced builder, Mr. Robert Jones, and pursue a career in the construction business. They formed the LLC and successfully completed several projects. By virtually all accounts, the company enjoyed a stellar reputation, as did Mr. Mackey himself.

In late 1998, after the LLC began to do business in Faulkner County, Mackey received a phone call from Rick Baney, one of appellant's loan officers, who expressed an interest in financing the company's next project. As a result, in early 1999, appellant financed the purchase of two residential lots and the construction of a home. At about this same time, Mackey became sole owner of the LLC.

The controversy that led to the present lawsuit began when the LLC purchased a piece of property near a hospital in Faulkner County for the purpose of constructing a medical-office building. In April 1999, the LLC obtained a $270,000 loan from appellant to purchase the land. However, on May 10, 1999, the University of Central Arkansas (UCA), which owned land adjacent to the LLC parcel, filed suit to enjoin all work on the LLC parcel in an attempt to acquire it through eminent domain. Ultimately, UCA's petition was denied, and on May 18, 1999, appellant sent the LLC a conditional commitment letter for $1.8 million in construction

financing. Upon receiving this letter, Mackey tendered his resignation to the ADFA and began work on the project.

Several weeks later, the LLC received a fax from appellant implying that the construction financing had not yet been approved, including, specifically, several conditions that had not been set out in the previous commitment letter. In an attempt to resolve the situation, Mackey met with appellant's regional manager of commercial loans, Tom Wetzel. As we noted in our prior opinion, Mackey and Wetzel "clashed immediately, and their relationship deteriorated to the point of outright hostility." *Mackey I*, 84 Ark. App. at 10, 129 S.W. 3d at 330. Following a few combative meetings and telephone calls, and an attempt by a third person, Bernard Veasley, to intervene on the LLC's behalf, Wetzel sent the LLC a letter on August 24, 1999, declining the LLC's construction loan on the medical-office building. Once the financing on that major project, which was already under way, fell through, the LLC began to lose money rapidly and was unable to pay its bills or continue other construction. Ultimately, numerous lawsuits were filed against the LLC, asserting claims of approximately $1.3 million.

On May 1, 2000, Mackey and the LLC sued appellant, alleging that, in reliance on appellant's commitment to provide financing, they had expended substantial resources on the medical-building project and suffered considerable financial losses when appellant's commitment was withdrawn. It was this allegation that eventually led to the LLC's recovery of breach-of-contract and promissory-estoppel damages following a jury trial. As previously mentioned, this court reversed the breach-of-contract verdict and affirmed the jury's $210,000 promissory-estoppel award.

Mackey and the LLC also contended in their complaint and at trial that, around the same time period that appellant withdrew its financing commitment, appellant defamed Mackey and the LLC by virtue of five incidents that destroyed their once excellent reputations. These incidents are fully recounted in our prior opinion, but, again, we will repeat them here for the sake of explanation.

The first incident that we discussed in *Mackey I* involved statements made by two of appellant's officers to the Gospel Temple Baptist Church. The church had obtained a $300,000 building loan from appellant and had entered into a contract with the LLC to construct the building. However, when appellant's

officers learned that the LLC would be the church's contractor, they told the church that the LLC was not on its "approved builders list," even though there was considerable evidence that no such list existed. Eventually, the church canceled its contract with the LLC and requested a refund of $133,000 it had paid on the contract. We held that this incident alone supported the jury's $175,000 defamation award, given that the LLC had to refund the money that the church had already paid and sustained reputational damage as well. *Id.* at 14–15, 129 S.W.3d at 332–33. However, we went on to discuss the other four incidents "in the interest of providing a complete account of the events that occurred in this case and because it may prove useful to the trial court's reconsideration of the punitive-damage issue . . . ." *Id.* at 16, 129 S.W.3d at 333.

Of those four incidents, the first involved appellant's returning some of the LLC's checks marked "NSF" (insufficient funds). This situation arose after Mackey had deposited a $65,000 check into the LLC account and immediately wrote $40,000 in checks thereon. When the $65,000 check turned out to be bad, Mackey was notified of that fact, and he promptly deposited $40,000 to $50,000 to cover the checks that the LLC had written. However, despite Mackey's quick action, appellant returned the LLC's checks marked "NSF" and accused Mackey of check-kiting, notwithstanding the fact that appellant and the LLC had established a course of dealing covering overdrafts up to a certain amount. In *Mackey I*, we stated that this incident would not support the jury's defamation award because the LLC presented insufficient proof that its reputation was damaged by the NSF notations.[1] However, we expressed "our conviction that [appellant's] conduct in this instance was particularly egregious and seemingly calculated to do harm to the LLC by unexplainedly abandoning an established practice." *Id.* at 17, 129 S.W.3d at 334.

The next incident occurred when appellant's loan officer, Tom Wetzel, told an officer at Regions Bank that appellant "wasn't lending Mr. Mackey any more money" and was "no longer doing business with Mr. Mackey." We declared these statements to be defamatory by implication because they were incomplete and tended to suggest, incorrectly, that Mackey and the LLC were unworthy of a loan. However, we said that the

---

[1] There was no testimony from the payees of the checks or anyone who had seen the NSF notation.

statements would not support the defamation verdict because Mackey and the LLC did not prove reputational damage by virtue of the statement.[2]

The final two incidents concern statements that Tom Wetzel made about George Mackey. Wetzel told Bernard Veasley, who was attempting to intercede in the construction-financing conflict to help the LLC, that Mackey was a "big, fat, damn slob" who was "f***ing up." Wetzel also called Mackey, who is an African-American man, a "big, black gorilla." In the prior appeal, appellant argued that these statements about Mackey personally did not support the jury's defamation award in favor of the LLC. We declined to reach that argument, having already decided that the defamation verdict was supported by one of the other incidents. However, we said that there was "no doubt that these statements are defamatory" and that "actual reputational damage was caused." *Id.* at 18-19, 129 S.W.3d at 335. We further took the opportunity to "express our revulsion toward such malicious and hateful language uttered by a bank about its customer." *Id.* at 19, 129 S.W.3d at 336.

Having affirmed the defamation verdict, we turned to appellant's challenge to the $5 million punitive-damage award. After ruling that appellant had waived any argument regarding a lack of substantial evidence to support a punitive-damage verdict, we examined the argument that the award was unconstitutionally excessive. We decided to remand that issue to the trial court because, while the appeal was pending, the United States Supreme Court decided *State Farm Mutual Insurance Co. v. Campbell*, 538 U.S. 408 (2003), in which the Court offered new thoughts and considerations on the constitutionality of punitive-damage awards. That remand gave rise to the present legal proceeding.

Upon remand, no new evidence was taken by the trial judge; rather, he ordered the parties to file briefs to assist him in re-evaluating the punitive-damage award. On September 23, 2004, the judge entered an order reducing the punitive award to $3.08 million. His decision was based, in part, on the fact that the award created what he considered to be a constitutionally acceptable 8-to-1 ratio of punitive damages to compensatory damages when both the defamation and promissory-estoppel verdicts were

---

[2] The Regions officer testified that he would have no problem with the LLC's being a contractor on a project.

combined. The judge also determined that the award was supportable in light of the reprehensible nature of appellant's conduct and in comparison to sanctions imposed for similar conduct in this state. Appellant appeals from that ruling and argues generally (along with some specific arguments that will be addressed later in the proper context) that the $3.08 million punitive-damage award does not comport with the due-process considerations established by the United States Supreme Court in cases such as *Campbell, supra*, and *BMW of North America v. Gore*, 517 U.S. 559 (1996).

As appellant correctly states, the Due Process Clause of the Fourteenth Amendment imposes limits on punitive-damage awards. *See TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993). The reason behind such limits is that elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that may be imposed. *See Campbell, supra*. In 1996, the Supreme Court in *Gore, supra*, developed three guideposts for evaluating the constitutionality of a punitive-damage award: 1) the degree of the defendant's reprehensibility or culpability; 2) the disparity between the penalty and the harm or potential harm suffered (usually defined by reference to the punitive-to-compensatory ratio); 3) the civil penalties authorized or imposed in comparable cases. We will now review the trial court's $3.08 million award in light of these considerations.

### Reprehensibility of the Defendant's Conduct

We begin by addressing a specific argument raised by appellant concerning the particular conduct that may be viewed in determining the degree of reprehensibility. Appellant contends that, because *Mackey I* held that only one defamatory statement — made by appellant's officers to the Gospel Temple Church — was proven to support the defamation award, only that conduct should be considered in determining reprehensibility, and this court should not consider the other four defamatory statements. We disagree.

Appellant bases its argument on language in *Campbell, supra*, that "a defendant should be punished for the *conduct that harmed the plaintiff*, not for being an unsavory individual or business." *Campbell*, 538 U.S. at 423 (emphasis added). According to appellant, this language means that, in assessing a punitive-damage award, a court

should not consider conduct by a defendant that did not result in compensated harm to the plaintiff. However, when *Campbell's* language is viewed in the light of its full holding, it is not as limiting as appellant suggests. In *Campbell*, State Farm was sued for bad faith, fraud, and outrage in connection with its failure to settle a liability claim against its insureds, the Campbells. At trial, evidence of State Farm's claims practices in other states was admitted and relied upon by the Utah appellate court in upholding the jury's $145 million punitive-damage award. The United States Supreme Court, in reviewing the award, noted that much of the evidence concerning State Farm's practices occurred in other states and bore no relation to claims like the Campbells'. As a result, the Court determined, the Campbells' case was "used as a platform" to expose and punish perceived deficiencies in State Farm's operations throughout the country. *Campbell*, 538 U.S. at 420. It was this concern that gave rise to the Court's pronouncement that a defendant should be punished for the conduct that "harmed the plaintiff." The Court was cautioning against evaluating a punitive award by considering conduct that may have harmed other, unrelated persons. We do not understand the Court to say that conduct bearing some nexus to the plaintiff's harm should be ignored. In fact, other language in *Campbell* makes it clear that such conduct may be considered. The Court noted that State Farm was improperly being condemned for its nationwide policies "rather than for the conduct directed toward the Campbells" and that punitive damages were improperly awarded to punish conduct "that bore no relation to the Campbells' harm." *Id.* at 420, 422. Further, the Court stated that a defendant's "*dissimilar acts, independent from the acts upon which liability was premised*, may not serve as a basis for punitive damages." *Id.* at 422-23 (emphasis added).

By contrast, in the case at bar, the other defamatory statements that appellant asks us to disregard were not directed to other persons and did not involve separate, unrelated claims; nor were they dissimilar acts, independent from the acts upon which liability was premised. Instead, they were part of a pattern of behavior directed toward the LLC, and they paint a telling picture of appellant's overall conduct and intent to cause harm.[3]

---

[3] *See Gore, supra,* 517 U.S. at 574, n. 21, and *TXO, supra,* 509 U.S. at 462, n. 28 (1993), recognizing that evidence of other transactions may be relevant in determining a defendant's degree of reprehensibility. *TXO* also considered evidence of a "pattern of fraud, trickery, and deceit." 509 U.S. at 462.

Appellant's argument is also contrary to our specific language in *Mackey I*, wherein we made a point of discussing the four remaining statements "in the interest of providing a complete account of the events that occurred in this case, *and because it may prove useful to the trial court's reconsideration of the punitive-damage issue.*" *Mackey*, 84 Ark. App. at 16, 129 S.W.3d at 333 (emphasis added). We went on to note at various points that appellant's conduct was "egregious" or "seemingly calculated to do harm," and we expressed our "revulsion" at the "malicious and hateful" statements made against Mackey personally. *Id.* at 17-19, 129 S.W.3d at 334-36. Thus, we contemplated that, upon remand, the trial judge would consider the full scope of appellant's behavior as it relates to this case. *See also Barber, supra*, a case involving a dangerous railroad crossing, where our supreme court, in determining the degree of the railroad's reprehensibility, considered a factor separate and apart from the personal injuries that occurred — the railroad's destruction of evidence after the accident. *Barber*, 356 Ark. at 303, 149 S.W.3d at 348.[4]

In light of the above, we conclude that we may consider all of appellant's egregious conduct in connection with the harm that befell the LLC. With that in mind, we now turn to the factors that weigh on a defendant's degree of reprehensibility.

In *Campbell, supra*, the Supreme Court elaborated on the matters to be considered when assessing the degree of a defendant's reprehensibility: 1) whether the harm caused was physical as opposed to economic; 2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; 3) whether the target of the conduct had financial vulnerability; 4) whether the conduct involved repeated actions or was an isolated incident; 5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Campbell*, 538 U.S. at 419. Appellant claims that only two of the five factors exist here — financial vulnerability and malice. However, in light of our holding that it was proper to consider conduct by appellant in addition to the one defamatory statement, a third factor also exists — conduct involving repeated actions — given that several statements were made by appellant in what seemed to be a continuing effort to inflict harm. With three of the five factors in existence,

---

[4] Although it is not clear, it also appears that, in *Hudson v. Cook*, 82 Ark. App. 246, 105 S.W.3d 821 (2003), this court, in evaluating a punitive-damage award, considered conduct other than that for which the plaintiff received compensatory damages.

particularly the existence of malice, there is ample evidence from which the trial court could have assessed appellant's conduct as having a significant degree of reprehensibility. The circumstances in this case, when viewed as a whole, would warrant a finding that appellant, at a time when the LLC was financially vulnerable and operating in good faith to conduct business that appellant had solicited, acted in a malicious manner calculated to do harm to a once-reputable business. There is also evidence that at least part of appellant's motivation may have been racial animosity, given Tom Wetzel's comments. Although appellant downplays the racial element because Mackey and the LLC did not file a discrimination action, we see no reason why the trial court or this court should be prohibited from considering a possible racial motivation simply because no claim was brought under the state Civil Rights Act or the federal Equal Credit Opportunity Act. Whatever legal strategy was involved in deciding not to pursue such claims, it has no bearing on the fact that appellant is to be judged by its conduct in this case and not on the plaintiffs' choice of remedies.

When all is considered, we conclude that there is a substantial degree of reprehensibility on appellant's part. Through malicious, calculating, and egregious acts and statements, appellant inflicted harm on the LLC to the point that it suffered considerable economic and reputational injuries. As our supreme court recognized in *Bank of Eureka Springs v. Evans*, 353 Ark. 438, 109 S.W.3d 672 (2003), the presence of bad faith, deliberate false statements, and acts of affirmative misconduct — all of which are present here — bear on whether a defendant's conduct has been reprehensible. While that same opinion notes that the infliction of purely economic harm, as arguably occurred in this case, is a factor weighing against reprehensibility, the U.S. Supreme Court noted in *Gore*, *supra*, at 576, that infliction of economic injury, especially when done intentionally through affirmative acts of misconduct or when the target is financially vulnerable, can warrant a substantial penalty.

### Ratio of Punitive Damages to Compensatory Damages

Our research indicates that this factor seems to engender great confusion and controversy in comparison with the other factors. We believe that this is due in no small part to the U.S. Supreme Court's rather conflicting statements on the matter. In one of the first cases to address the constitutionality of punitive damages, *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1,

23-24 (1991), the Court stated that a punitive-damage award of more than four times the amount of compensatory damages might be "close to the line." However, two years later, in *TXO, supra*, a case involving an oil company's scheme to reduce or eliminate its royalty obligations, the Court approved a $10 million punitive-damage award that accompanied a $19,000 compensatory verdict, a 526-to-1 ratio. The Court noted that it would not draw a mathematical bright line between acceptable and unacceptable punitive awards but stated that "a general concern of reasonableness properly enters into the constitutional calculus." 509 U.S. at 458. Three years after *TXO*, the Court decided *Gore, supra*, which involved an auto company painting over a damaged vehicle without revealing the damage to the buyer. The Court reversed a $2 million punitive award that accompanied a $4000 compensatory verdict, a 500-to-1 ratio.

Finally, in *Campbell, supra*, the Court dealt with a situation in which the plaintiffs received $1 million in compensatory damages and $145 million in punitive damages, a 145-to-1 ratio. The *Campbell* Court stated that it would not impose a bright-line ratio but observed that, in practice, few awards exceeding a single-digit ratio, to a significant degree, will satisfy due process. *Campbell* is the most recent statement on this subject by the U.S. Supreme Court.

With these cases in mind, we review the particular arguments made by appellant. Appellant contends first that the trial judge erred in calculating the ratio in this case. The judge combined the defamation and promissory-estoppel verdicts to arrive at $385,000 as the "denominator" figure in the ratio and used that figure to support a punitive award of $3.08 million, an 8-to-1 ratio. Appellant claims that only the $175,000 tort award should have been used and, had that occurred, the punitive award would have borne a more constitutionally suspect 17.6-to-1 ratio.

On this point, we first consider appellant's claim that, in *Mackey I*, this court recognized that only the defamation damages should be considered in arriving at the ratio. Appellant is referring to the statement that we made in *Mackey I* that the punitive award bore a 28.5-to-1 ratio to the compensatory award — a figure we could only have reached by considering the $175,000 awarded for defamation as the compensatory denominator. According to appellant, our statement is now law of the case on this issue. We disagree.

■ It is well settled that the decision on the first appeal becomes law of the case and is conclusive of every question of law or fact decided in the former appeal. *Ghegan & Ghegan, Inc. v. Barclay*, 345 Ark. 514, 49 S.W.3d 652 (2001). However, the context of the appellate court's ruling in the first appeal must be considered, and the court's pronouncements are generally effective only on issues that it actually decides. *See id.* In referring to the 28.5-to-1 ratio in *Mackey I*, we were simply echoing what the trial court and appellant had declared the ratio to be at the trial level; we made no independent calculation of our own. Moreover, the issue of the makeup of the compensatory denominator was not before us, and we made no studied assessment of what compensatory damages should be included in the ratio; we merely remanded the damage award for reconsideration. Our case law is clear that we are not bound by a conclusion stated as obiter dictum, even if couched in terms that infer that the court reached a conclusion on the matter. *See, e.g., Clemmons v. Office of Child Support Enfcm't*, 345 Ark. 330, 47 S.W.3d 227 (2001); *Green v. State*, 343 Ark. 244, 33 S.W.3d 485 (2000); *see also Ward v. Williams*, 354 Ark. 168, 118 S.W.3d 513 (2003). We therefore reject appellant's law-of-the-case argument.

■ Appellant continues by arguing that a punitive recovery should only be "predicated" on tortious acts, given that Arkansas law does not permit recovery of punitive damages on contract or equitable theories. *See L.L. Cole & Son, Inc. v. Hickman*, 282 Ark. 6, 665 S.W.2d 278 (1984) (holding that, ordinarily, punitive damages for breach of contract are not allowed); *Toney v. Haskins*, 7 Ark. App. 98, 644 S.W.2d 622 (1983) (holding that equity will not ordinarily enforce penalties). While it is generally true that contract damages do not support a punitive award, they may be awarded where the defendant commits a willful and malicious act in connection with the contract. *See, e.g., Dews v. Halliburton Indus.*, 288 Ark. 532, 708 S.W.2d 67 (1986). However, we need not reach the substance of this issue. Even if appellant is correct that the trial court should have considered only the $175,000 defamation verdict in evaluating the reasonableness of the punitive award, we do not believe that the ensuing 17.6-to-1 ratio would be unconstitutionally excessive under the circumstances of this case. In *Barber, supra*, our supreme court stated that the standard to be employed in reviewing a punitive-to-compensatory ratio is whether the ratio is "breathtaking." *Barber*,

356 Ark. at 303, 149 S.W.3d at 348. The conduct by appellant, as recited earlier in this opinion, is such that a 17.6-to-1 ratio is not breathtaking. Moreover, even though this ratio is greater than the single-digit ratio mentioned in *Campbell, supra,* the Supreme Court has made it clear that it will not draw a bright line on this matter. Even *Campbell* recognizes that "the precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." 538 U.S. at 425.

### Punishment for Comparable Conduct

■ Under this guidepost, courts ordinarily consider both the comparable criminal penalties for the type of conduct involved and the awards that have been made in similar court cases. Arkansas Code Annotated section 5-15-105 (Repl. 1997) makes it a crime to utter certain types of slander, including that which injures credit or business standing. Arkansas Code Annotated section 5-15-101 provides that slander shall be a felony, with punishments of six months to three years in prison and fines of $50 to $3000, or both.[5] Thus, the punitive award in this case far exceeds the monetary penalty provided by the criminal statute; but, we note that the statute also permits the imposition of a significant period of incarceration.

As for comparable cases, appellant cites two defamation cases decided by our supreme court in recent years, *Ellis v. Price,* 337 Ark. 542, 990 S.W.2d 543 (1999), and *United Insurance Co. of America v. Murphy,* 331 Ark. 364, 961 S.W.2d 752 (1998), where punitive damages in ratios of 1-to-1 and 3.3-to-1 were imposed, respectively. However, we observe that neither of those cases engaged in the federal due-process analysis set forth in *Gore.* Further, the ratios do not tell the whole story. The *Murphy* case, in which the monetary value of the punitive verdict was $2 million, should certainly give notice that a substantial exemplary award in the millions of dollars may be imposed in a defamation case. *See also Routh Wrecker Service v. Washington,* 335 Ark. 232, 980 S.W.2d 240 (1998), a case involving a non-physical-injury tort, abuse of process, where a 75-to-1 ratio was allowed to stand after undergoing the *Gore* analysis.

---

[5] These statutes were repealed by our legislature by Act 1994 of 2005. However, they were in effect at the time of appellant's conduct in this case.

In light of the foregoing, and given the unique facts and circumstances of this case, we believe that the $3.08 million punitive award is in line with federal due-process considerations. We therefore affirm the award.

## Cross-Appeal

 The LLC contends on cross-appeal that the jury's original $5 million verdict should be reinstated. It argues that the egregious nature of appellant's conduct, the State's interest in protecting its citizens from defamation and racial animus, and the respect to be accorded a jury's verdict, justify reinstatement of the full award. The LLC also points to "the defendant's wealth," which is a factor we address when evaluating a punitive-damage award under Arkansas common law. *See Hudson, supra.*[6]

The points made by the LLC are well taken. However, appellate consideration of a punitive-damage award under the United States Constitution is not a review of a jury's finding of fact. *See Cooper Indus., Inc. v. Leatherman Tool Group,* 532 U.S. 424 (2001). Rather, our task is to engage in a de novo, independent review and determine whether the award is excessive under constitutional guidelines. *See id.* To say the least, such a review is not an exact science but is a fluid analysis, based on the particular facts and circumstances of each case. We therefore conclude, without the need for further discussion, that, in light of all of the factors previously discussed in this opinion, the $3.08 million punitive award serves the requirements of due process better than the $5 million award. We therefore affirm on cross-appeal.[7]

Affirmed on direct appeal and cross-appeal.

PITTMAN, C.J., and GLADWIN, J., agree.

---

[6] The trial court found that the $3.08 million award was less than three percent of appellant's net worth.

[7] The LLC also argues that, in the prior appeal, appellant waived any argument regarding the excessiveness of the punitive damages. We obviously believed in *Mackey I* that the issue was not waived because we remanded it to the trial court for reconsideration.