CAPITAL STEEL COMPANY, INC.
*v.* FOSTER AND CREIGHTON COMPANY

78-163                                        574 S.W. 2d 256

Opinion delivered December 11, 1978
(Division I)

684

*House, Holmes & Jewell,* for appellant.

*Friday, Eldredge & Clark,* by: *Bill S. Clark* and *David A. Orsini,* for appellee.

GEORGE ROSE SMITH, Justice. The appellee F & C, a construction company, brought this suit for damages for breach of contract against the appellant Capital Steel, a supplier and fabricator of steel products. The complaint sought $63,909.56 in damages as a result of Capital Steel's complete failure to perform its contract to supply spproximately 1,229,-030 pounds of reinforcing steel bars to F & C for use in the construction of a highway bridge at Camden. On the direct appeal the only question is whether the trial judge was right in directing a verdict for F & C in the amount sued for. There is also a cross appeal, involving another contract relating to a bridge at Searcy, which will be discussed separately.

On the direct appeal Capital Steel admits that it wholly failed to supply the steel at $10.80 per hundredweight, as its contract required. Capital Steel contends, however, that it raised a jury question by introducing evidence to show that F & C was guilty of unreasonable delay in not directing the actual delivery of the steel until about a year after the contract was made. The trial judge found as a matter of law that there was no unreasonable delay and accordingly directed a verdict for the plaintiff. We agree with his decision.

F & C's contract with the state highway department was for the construction of the steel and concrete superstructure of a bridge at Camden. F & C solicited bids from suppliers of steel and eventually awarded the contract to Capital Steel. The contract was evidenced by a purchase order, dated October 15, 1973, which contained the details of the agreement and provided that shipments to the jobsite at Camden were to be made "as directed." After a delay of more than a month Capital Steel accepted the contract by signing and returning a copy of the purchase order.

The steel to be supplied consisted of reinforcing bars that had to be cut to length and bent into the proper shape to be used in the concrete work in the superstructure of the bridge. After accepting the purchase order in November Capital Steel prepared its shop drawings showing how the bars were to be fabricated and bent. Those drawings were approved by the highway department in late December. Capital Steel, however, did not make a firm contract with a steel mill for the steel it would need to perform its contract.

In February, 1974, and again in March, the price of steel rose. In September progress in the construction of the foundation and piers of the bridge had reached a point at which it could be seen that the installation of the superstructure would soon begin. Billy J. Price, an officer of F & C, called Stuart Perry, an officer of Capital Steel, and discussed the situation. Perry said that Capital Steel could no longer furnish the steel at the contract price. The parties tried over a period of months to adjust the matter, but eventually F & C had to buy the steel elsewhere at a price of $16 per hundredweight, resulting in a loss of $63,909.56, which is the amount sued for.

At the trial Capital Steel took the position that the purchase order was ambiguous in specifying that the steel be delivered "as directed." Two officers of Capital Steel testified that they thought a reasonable time for the delivery of the steel would have been about three months. March, April, and May, 1974, were mentioned in their testimony as possible times for delivery. The trial court held, however, that F & C acted within a reasonable time, because its request for

delivery of the steel was within the time that F & C could perform its contract with the highway department without penalty.

The undisputed evidence supports the trial court's conclusion. F & C's contract was only for the superstructure of the bridge. The foundation and piers had to be constructed by others and necessarily took a substantial period of time. After that, F & C had to install the girders for the superstructure before it could begin using the reinforcing steel in the concrete work. The girders, in place, were 2,080 feet long. They had to be specially made, transported to the job, and put in place. That process required several months for completion. Capital Steel's officers were of course charged with knowledge, and certainly had knowledge, of the kind of job they were bidding on. There is no basis in the proof for a belief on their part that their deliveries would be made in March, April, or May. Moreover, the price of steel had risen in February and March. Hence Capital Steel was no worse off with respect to prices late in the year than it would have been within a period it regarded as reasonable.

Capital Steel's officers testified that their expectancy that deliveries would begin within about three months was based on their experience in performing four earlier contracts with F & C. Those contracts, however, were for comparatively small jobs. The testimony about those earlier jobs was not sufficient to afford the jury a basis for finding that the course of dealing between the parties had given to the words "as directed" the meaning that Capital Steel now attributes to them. Consequently there was no reason to submit such an interpretation to the jury under Ark. Stat. Ann. § 85-1-205 (Supp. 1977).

Capital Steel also argues that the amount of F & C's damages was in dispute and should have been submitted to the jury. Even if this point was raised below, which does not clearly appear, it has no merit. The assessment of damages was simply a mathematical computation of the difference between the contract price and what F & C had to pay elsewhere. Those figures are undisputed. It is immaterial that Capital Steel eventually offered to supply the steel at $15 per

hundredweight. That offer was a compromise, conditioned upon F & C's releasing its claim for damages, and does not represent the price at which F & C could buy the steel in the open market.

We conclude on the direct appeal that the trial court was right in directing a verdict for F & C. There remains for decision the single issue raised by the cross appeal.

This controversy arises from a similar purchase order by which Capital Steel agreed to furnish approximately 1,010,-570 pounds of steel, at $17.54 per hundredweight, for a bridge job at Searcy. When about half the steel had been fabricated and delivered, F & C wrongfully refused to accept further performance. Later on, when F & C brought this suit against Capital Steel for breach of the Camden contract, Capital Steel filed a counterclaim for its loss on the Searcy job. With respect to the measure of damages the trial court gave the following instruction, which is based upon § 2-708 (2) of the Uniform Commercial Code, Ark. Stat. Ann. § 85-2-708 (2) (Add. 1961):

> If you find Foster & Creighton breached the Searcy agreement, you then have the duty of determining Capital Steel's damages. The measure of damages for a breach by a buyer is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer. The measure of lost profits is measured by the contract price less Capital Steel's manufacturing costs.

F & C is not in a position to argue, as it attempts to do, that the instruction is not a correct statement of law. In that respect F & C's objection to the instruction was merely "that it is an incorrect declaration of the law." That is a general objection which raises no point for review. Uniform Rules for Circuit and Chancery Courts, Rule 13.

F & C also objected, however, that there was no proper proof of damages and therefore no instruction at all on the issue of damages should have been given. Thus the question on cross appeal is whether Capital Steel made sufficient proof

of its damages to present an issue for the jury.

Capital Steel's proof was simple. F & C wrongfully terminated the contract on March 27, 1975. On that date Capital Steel still was to deliver 418,903 pounds of steel under the contract, none of which had yet been fabricated for the job. The market price at which Capital Steel could have bought steel on that date was $10.34 per hundredweight. Capital Steel's total manufacturing costs would have been $1.66 per hundredweight, leaving a profit of $5.54 per hundredweight at the contract price of $17.54. That would amount, on the undelivered 418,903 pounds, to $23,207.23, which was the sum sought in the counterclaim. The jury's verdict for Capital Steel on the counterclaim was for $17,250.

On March 27, 1975, there was an anticipatory repudiation of the contract, for which Capital Steel was entitled under the U.C.C. to resort to any available seller's remedy for the breach. § 85-2-610. A seller's possible remedies are enumerated in § 85-2-703. The present situation falls most nearly under subsection (e) of that section, by which the seller may "recover damages for non-acceptance" under § 85-2-708. Subsection (1) of § 85-2-708 is not applicable, because Capital Steel had not yet fabricated the steel and so could not have made a tender of actual performance. We must therefore turn to subsection (2), which governs when subsection (1) is not applicable.

Subsection (2) was the basis for the trial court's instruction, quoted above, and provides broadly that the measure of damages is the net profit that the seller would have made from full performance if there had been no anticipatory repudiation. Capital Steel's proof was, in our opinion, amply sufficient to make a prima facie showing that its net profit from full performance would have been $23,207.23.

F & C, in arguing that Capital Steel's proof was fatally deficient, relies upon the fact that on March 27, 1975, Capital Steel had on hand in its inventory more than the 209 tons of unfabricated steel that would have been required to fulfill its contract with F & C. That steel had been bought at various times, at various prices, and was later fabricated and sold by

Capital Steel to various other customers. F & C argues that Capital Steel, to prove its exact damages, should have determined just what it had paid for the steel that would have been used to perform the F & C contract. F & C also argues that the market price should not have been determined as of March 27, 1975, the day of the repudiation, but instead the price should have been determined either by what Capital Steel actually paid for the steel in its inventory or by the market value on the probable dates of delivery if the F & C contract had been performed. F & C also argues that Capital Steel should have shown the price at which it ultimately sold the steel in its inventory.

F & C's various criticisms of Capital Steel's proof do not add up to reversible error, in the sense that Capital Steel is shown to have failed to make a submissible issue for the jury (which was the only objection made below). The UCC establishes at the outset this general policy: "The remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." § 85-1-106. It must be remembered that F & C was the party at fault. Even if F & C had allowed Capital Steel to fully perform the contract, F & C could not have demanded that Capital Steel use any particular ton of steel in its inventory in supplying the Searcy job. To the contrary, Capital Steel could have used its entire inventory in supplying other customers and have made new purchases for the Searcy job. Consequently Capital Steel was not required, in making a prima facie case, to prove all the in-and-out ramifications of its inventory that F & C now considers essential.

That the steel in the inventory may have later been sold at a profit is not necessarily material, for Capital Steel may have been in a position to make a profit on two transactions instead of one. See Harris, A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared, 18 Stanford L. Rev. 66, 80 (1965). The jury was evidently not completely satisfied with Capital Steel's proof, for the verdict was about $6,000 less than the amount claimed. The decisive point, however, is that a submissible issue was made by the testimony. That ends the matter.

Affirmed.

We agree. HARRIS, C.J., and HOLT and HOWARD, JJ.