MDH BUILDERS, INC. *v.* NABHOLZ CONSTRUCTION
CORPORATION

CA 99-1317 17 S.W.3d 97

Court of Appeals of Arkansas
Division IV
Opinion delivered May 17, 2000
[Petition for rehearing denied June 28, 2000.]

*David A. Orsini*, for appellant.

*Friday, Eldredge & Clark*, by: *Jeffrey H. Moore*, for appellee.

MARGARET MEADS, Judge. This case concerns a breach-of-contract/promissory estoppel lawsuit filed by appel-

lee Nabholz Construction Corp., a general contractor, against appellant MDH Builders, Inc., a subcontractor. The chancellor found in favor of appellee and awarded $90,998 in damages, plus $22,500 in attorney fees. Appellant raises several points of error on appeal, none of which merit reversal. Therefore, we affirm.

On March 9, 1994, appellee Nabholz submitted a $6,000,000-plus bid to Wal-Mart Stores, Inc., to act as general contractor on a construction project. Earlier the same day, appellant MDH, through its vice-president Ricky Marise, had submitted a $245,777 subcontract bid to appellee to perform the following work on the project: metal stud framing, gypsum board/tape and finish, rough carpentry, roof blocking, millwork installation, acoustical ceiling, F.R.P. panels, installation of door and frame hardware, toilet compartments, toilet accessories, and batt insulation. Appellee used appellant's subcontract bid in computing its own general-contract bid.

By March 11, Wal-Mart informed appellee that it had been awarded the general contract. On or about that same day, appellee's senior vice-president, Earl Ballentine, called Ricky Marise of MDH and informed him that "he [Marise] was the low bidder and we were going to do a job with him." According to Ballentine, Marise had been anxious to hear about the job and was very excited. On March 23, Marise faxed a completed subcontractor information form to appellee, and on April 5, he attended appellee's preconstruction meeting. However, on April 7, appellant's president, Mike Hill, called appellee's CEO, Dan Nabholz, and informed him that Marise would no longer be associated with MDH. He also asked that the subcontract be allowed to go with "an employee who was starting up his own firm." Mr. Nabholz told Hill that the contract was in the name of MDH and that MDH must honor the contract, but also told Hill that he would have to talk to Ballentine. Ballentine spoke with Hill soon thereafter and was told that appellant did not want to perform the subcontract. As a result, appellee acquired substitute performance and executed a $287,669 contract with Systems Painters, Inc. Additionally, some of the work included in appellant's bid was performed by appellee, using its own labor and materials, at a cost of $50,156.

On May 2, 1996, appellee sued appellant in Pulaski County Chancery Court for its failure to perform the subcontract. The

complaint asserted the theories of breach of contract and estoppel and sought damages of approximately $90,000. A trial was held on the matter, and the chancellor entered an order awarding appellee $90,998. This sum represented the total amount of costs expended by appellee ($337,825), less appellant's bid price ($245,777), less $1,050 deducted as the result of a change order issued during the construction process. Appellant appeals from that order.

■ Chancery cases are tried *de novo* on appeal. *Adkinson v. Kilgore*, 62 Ark. App. 247, 970 S.W.2d 327 (1998). However, we do not reverse a chancellor's findings of fact unless they are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.*

■ Appellant's first argument is that appellee did not prove that a contract existed between Nabholz and MDH. The essential elements of a contract are: 1) competent parties; 2) subject matter; 3) legal consideration; 4) mutual agreement; and 5) mutual obligations. *Hunt v. McIlroy Bank & Trust*, 2 Ark. App. 87, 616 S.W.2d 759 (1981). According to appellant, the element of mutual agreement is lacking in this case. It contends that the chancellor erred in finding that appellee accepted appellant's bid offer based upon appellee's mere use of the bid. However, appellee's use of appellant's bid was not the only evidence of mutual agreement in this case. The words and conduct of Ballentine and Marise manifested a mutual assent to the contract. Acceptance of a contract may be accomplished by words or conduct. *See Childs v. Adams*, 322 Ark. 424, 909 S.W.2d 641 (1995). In this case, Earl Ballentine communicated to Ricky Marise on or about March 11 that Marise was the low bidder and that they would be doing a job together. According to Ballentine, this meant that appellee had accepted appellant's bid. Marise obviously understood because he was excited to get the job. Further, Marise submitted a subcontractor information sheet to appellee on March 23 after receiving Ballentine's call, and attended a preconstruction meeting on April 5 after being invited along with other subcontractors and suppliers. Given this evidence, we cannot say that there is error on this point.

■■ Appellant also contends that mutual assent was lacking because appellee did not accept MDH's bid in accordance with its

terms. According to appellant, appellee attempted to vary the terms of the bid by deleting the millwork from it and awarding that part of the bid to another subcontractor. Appellant cites *Drennan v. Star Paving Co.*, 51 Cal.2d 409, 333 P.2d 757 (1958), for the proposition that a general contractor cannot reopen negotiations with the subcontractor and at the same time claim a continuing right to accept the original offer, and cites *R.J. Daum Constr. Co. v. Child*, 122 Utah 194, 247 P.2d 817 (1952), for the proposition that to create a binding contract, an acceptance must unconditionally agree to all the material provisions of the offer. Arkansas law is in accord with these general statements of law. Our supreme court has recognized that, to be effective, an acceptance must be identical with the terms of the offer. *Rounsaville v. Van Zandt Realtors*, 247 Ark. 749, 447 S.W.2d 655 (1969). Additionally, while the introduction of new terms may indicate a willingness to negotiate further, such a response is a counteroffer, not an acceptance. *See id.*

 The evidence in the case at bar shows that, on bid day, appellee completed a bid sheet that listed not only the full amount of appellant's bid, which included millwork, but the full amount of a bid made by another prospective subcontractor, Challenge Construction, which also included millwork. Further, a written contract prepared for appellant's signature, but which was never executed, did not mention millwork. Appellant contends that this evidence, and evidence that appellant had changed the terms of bids on other, unrelated subcontracts, shows that appellee's acceptance did not mirror the offer. However, Earl Ballentine explained at trial that, on bid day, subcontract bids are submitted in various forms, requiring the placement of bid amounts under certain categories. He said he was not aware of an overlap on the millwork at the time he spoke with Mike Hill, nor did he attempt to renegotiate the price of the subcontract bid with Hill. His testimony indicates that the overlap was inadvertent. Further, the unexecuted written contract with MDH was for $245,777, the exact amount of MDH's bid. Thus, the contractor here did not reopen negotiations with the subcontractor, nor attempt to add new, material conditions by submitting a contract with terms that were directly contrary to the original bid. We find no reversible error on this point.

 Appellant's next argument is that appellee did not prove it was entitled to recover on the theory of promissory estoppel. Under the promissory-estoppel theory, a subcontractor's bid

may become binding when its promise, which it should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the general contractor, does induce such action or forbearance and injustice can be avoided only by enforcement of the promise. *See Reynolds v. Texarkana Constr. Co.*, 237 Ark. 583, 374 S.W.2d 818 (1964). Appellant contends that because there was evidence at trial that MDH did not meet certain specifications that Wal-Mart required all subcontractors to meet, appellee could not have reasonably relied on MDH's bid. We need not reach this issue. Promissory estoppel may be used as a basis for recovery when the formal elements of a contract do not exist. *See Reynolds v. Texarkana Constr. Co., supra.* We have held that the trial court was correct in finding that a contract existed between appellant and appellee. Therefore, there is no need to explore whether appellee proved entitlement to relief on an extra-contractual theory. Along these same lines, we need not address the chancellor's declaration that he saw no difference between the contract and estoppel theories. We believe the chancellor was referring to the fact that, under either theory, appellee's monetary recovery would be the same. In any event, we have affirmed the chancellor on his finding that a contract existed, and a trial court's ruling will be affirmed if it is correct for any reason. *Rager v. Turley*, 68 Ark. App. 187, 6 S.W.3d 113 (1999).

We now turn to appellant's claim that Ricky Marise did not have the authority to enter into a contract with appellee. Ricky Marise was the vice-president of MDH. Mike Hill admitted that Marise's duties included submitting prices on bids. Although he claims that Marise's employment was terminated between March 14 and March 30, the evidence is conflicting on that point. There is no evidence that Marise was not employed on March 9 when he submitted the bid or on March 11 when Ballentine accepted the bid. Further, Hill admits that he had discussions with Marise regarding this bid and another, similar Wal-Mart bid. He did not indicate in his testimony that he objected to Marise submitting these offers. It is also noteworthy that Marise submitted the subcontractor information sheet to appellee on March 23 with the assistance of appellant's comptroller and attended the preconstruction meeting on April 5 with another MDH employee and signed in as a representative of MDH.

 Whether an agent is acting within the scope of his apparent or actual authority is a question of fact. *Hot Stuff, Inc. v. Kinko's Graphic Corp.*, 50 Ark. App. 56, 901 S.W.2d 854 (1995). Apparent authority is such authority as a principal knowingly permits an agent to assume or which he holds the agent out as possessing. *See Mack v. Scott*, 230 Ark. 510, 323 S.W.2d 929 (1959). It is such authority as an agent appears to have by reason of actual authority that he has and such authority as a reasonably prudent person, using diligence and discretion, in view of the principal's conduct, would naturally suppose an agent to possess. *See id.* Marise was vested with the title of vice-president and had the actual authority to prepare and submit bids on projects. A reasonable and prudent person could thus conclude that he had the concomitant authority to receive communications regarding the acceptance of a project that he had bid upon. We find no error on this point.

The next set of issues concerns items of evidence that appellee introduced to prove damages. Appellant contends first that appellee should not have been allowed to prove its damages by merely introducing a copy of its $287,669 contract with Systems Painters, the substitute subcontractor. It claims that proof of what the job actually cost Systems should have been introduced, preferably through a representative of Systems. Appellant cites *Advance Constr. Co., Inc. v. Dunn*, 263 Ark. 232, 563 S.W.2d 888 (1978), in support of its argument. However, that case is inapplicable. In *Dunn*, a subcontractor sued the general contractor that prevented him from completing his subcontract. As damages, the subcontractor sought the amount of its contract price, less what it would have cost to do the job. To refute the subcontractor's evidence of cost, the general contractor offered proof of what it had paid the substitute contractor. The appellate court held that the proper way to refute the subcontractor's evidence of cost would be to prove what the job actually cost the substitute subcontractor. The case before us, however, does not involve the type of damages sought in *Dunn*; it involves damages sought against a subcontractor for the subcontractor's failure to perform.

 Our research has not revealed any Arkansas authority directly on point regarding the proper measure of damages in such a case, nor have the parties cited us to any. However, in *Capital Steel Co. v. Foster & Creighton Co.*, 264 Ark. 683, 574 S.W.2d 256 (1978), our supreme court impliedly recognized that, when a general con-

tractor sues a supplier for failure to perform, his damages are the difference between the contract price of the materials and what the contractor had to pay elsewhere. Other authorities have held under similar though not identical circumstances that when a contractor refuses to perform, damages may be recovered against him for the difference between his bid and the cost of having the work performed by others. *See Westland Constr. Co. v. Chris Berg, Inc.*, 215 P.2d 683 (Wash. 1950); *Sorenson v. Ewing*, 8 Ariz. App. 540, 448 P.2d 110 (1968). *See also* 17B C.J.S. *Contracts* § 594 (1999), recognizing that a general contractor that is forced to complete a subcontractor's work because of the subcontractor's abandonment of the project may recover for expenses incurred in completing the work less the amount it would have paid the subcontractor had no breach occurred. That is precisely the proof that was offered in this case. Appellee offered evidence of the difference between MDH's bid and the cost of obtaining substitute performance. Therefore, we find no error in the evidence introduced by appellee to prove its damages and hold that the correct measure of damages was used.

 Appellant argues next that appellee's evidence did not constitute a reliable computation of items of labor and material to be attributed to MDH due to the breach. The evidence offered by appellant to make this point is complex and difficult to follow. Nevertheless, upon careful review of it, we are persuaded that the chancellor did not err in assessing damages. During appellant's examination of Earl Ballentine regarding improper items purportedly charged to MDH, the chancellor declared that Earl Ballentine testified that "nothing was charged against MDH for those. And I don't know how it can be said any clearer or plainer." The chancellor apparently believed Ballentine's testimony that no charges were made to MDH for work not attributable to the subcontract. On matters of credibility, we defer to the chancellor. *Stout v. Stout*, 4 Ark. App. 266, 630 S.W.2d 53 (1982). Regarding appellant's related argument that Ballentine was not the proper custodian of the records introduced to prove damages, appellant cites no legal authority for its claim. Arguments made without citation to authority or convincing argument will not be addressed on appeal. *Dugal Logging, Inc. v. Arkansas Pulpwood Co.*, 66 Ark. App. 22, 988 S.W.2d 25 (1999).

 Finally, appellant asks us to reverse the attorney fees awarded under Ark. Code Ann. § 16-22-308 (Repl. 1999) because

the chancellor awarded damages based upon promissory estoppel rather than breach of contract. Without deciding whether promissory estoppel would support a fee award, we uphold the award based upon our interpretation that the chancellor's decree awarded damages for breach of contract.

Affirmed.

ROBBINS, C.J., and BIRD, J., agree.