SLIP OPINION

Cite as 2014 Ark. App. 638

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-14-309

| | |
|---|---|
| KEITH CAPPS LANDSCAPING & EXCAVATION, INC. | **Opinion Delivered** November 12, 2014 |
| APPELLANT | APPEAL FROM THE POPE COUNTY CIRCUIT COURT [NO. CV 2012-268] |
| V. | |
| VAN HORN CONSTRUCTION, INC., AND TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA | HONORABLE DENNIS CHARLES SUTTERFIELD, JUDGE |
| APPELLEES | AFFIRMED |

## RITA W. GRUBER, Judge

This is a breach-of-contract case filed by appellee, Van Horn Construction, Inc., a general contractor, against appellant, Keith Capps Landscaping & Excavation, Inc., a subcontractor. After a bench trial, the circuit court found that Capps had breached the parties' subcontract by failing to perform the work in accordance with the contract's plans and specifications and ultimately by refusing to complete the contract. The court awarded Van Horn $245,632 in damages, plus costs and attorneys' fees. On appeal, Capps argues that the trial court erred in finding that it breached the subcontract and in awarding an amount in damages that is in excess of the actual "reasonable damages." We find no error and affirm the judgment of the circuit court.

In September 2010, Van Horn was awarded the bid as general contractor for the expansion of the Searcy water-treatment plant. In connection with that project, Van Horn

sought subcontractor bids for the demolition and earthwork from various firms, including Capps. Capps submitted two bids, which Van Horn rejected because it determined that the amount of fill was overestimated in one bid and underestimated in the other. Van Horn accepted Capps's third proposal, and the parties executed a subcontract on January 3, 2011, in which Capps agreed to "[f]urnish all required labor, equipment, and materials to complete the dirtwork for the Searcy Water Treatment Plant Expansion per plans, specifications, and addenda by Garver Engineers." The contract included, among other tasks, excavation and fill for the sedimentation basin. In exchange for this work, Van Horn agreed to pay Capps $131,700.

There was some confusion in the beginning of the project about the type of fill material Capps could use for the sedimentation basin.[1] In this project, the basin was to be set on fill material that was placed in layers, or lifts. Each lift was designed to be six to eight inches high and had to be compacted and tested for proper compaction and moisture content before another lift was placed on top of it. The specifications required that "class 7" material be used, but Keith Capps, the owner of Capps, testified that he understood from Van Horn when he submitted bid proposals that he could use shale, which is not a class 7 material and which is a considerably cheaper material. Van Horn eventually convinced Wendell Williams, who was the project-construction observer for the project engineer, and the geotechnical engineering firm, Grubbs Engineering, to allow Capps to use material that it submitted for

---

[1]According to the parties, a sedimentation basin is a large concrete structure used to hold the fresh water being treated to allow the natural particles to settle to the bottom before the water is transported to a filter.

SLIP OPINION

testing from its "borrow pit," which was originally brought to the site for this purpose. The borrow pit included shale.

However, when Capps began work on the sedimentation basin, numerous tests of its lifts failed—generally due either to the moisture content being too high or the shale not being sufficiently broken up, or processed—and Capps was required to constantly rework the lifts and reprocess the material, causing considerably more work and expense than it had anticipated. The project manager for Van Horn, Mark Hurley, testified that when shale is "dug out," it comes out in large chunks. The specifications called for the material to be processed to a certain gradation to be properly compacted. Thus, Capps was required to process the material before placing it to meet the moisture and compaction requirements. In addition, Mr. Hurley testified that Capps was attempting to place the fill in layers that were too thick rather than placing it in six-to-nine-inch layers as the specifications required.

Although Mr. Hurley testified that the plans and specifications were always available for Capps's review on the company website and indeed had been brought to a meeting with Capps before Capps submitted his third proposal, Keith Capps testified that he did not see the plans and specifications for the project until the day Van Horn picked up Keith's copy of the signed subcontract. Keith signed the contract, which included specifications regarding the lifts and fill material, without reviewing the specifications. He testified that he was instructed by Van Horn before the contract was signed to use shale for the fill material because it was cheaper than other fill material. Keith also testified that it was his understanding that he would be allowed to stockpile material next to the fill site but that after the project began, he was

required to stockpile material 250 yards away and use a loader and dump truck to move it. He said that he had not anticipated this extra work and expense. He said that he told Van Horn that it was impossible to accomplish the lifts with the material he was using, but he was unable to get the matter resolved. He attempted to get Van Horn to agree to a change order to help with the processing or use a different material, but according to Keith, Van Horn refused. Mr. Hurley testified that Van Horn did offer to split the cost of "B stone" that did not require as much processing to use as fill, but Capps declined the offer and quit the project.

Van Horn notified Capps pursuant to Article 10 of the subcontract that Capps had forty-eight hours to return to the job or Van Horn would terminate the contract. Article 10 states in pertinent part as follows:

> If Subcontractor persistently or repeatedly fails or neglects to carry out the work or otherwise to perform in accordance with the Subcontract, Contractor may, at its option and after forty-eight (48) hours notice to Subcontractor . . . (ii) declare this Subcontract terminated, take possession of all materials, tools and appliances belonging to Subcontractor whether on the job site or stored elsewhere pursuant to agreement, and either complete the work itself or contract with other parties for the completion thereof.

When Capps did not return to finish the project, Van Horn completed the job by hiring other subcontractors, obtaining fill material and rental equipment, and performing some of the work itself. Van Horn submitted an itemized list of the costs to complete the project and the liquidated damages Van Horn was required to pay to the owner for the delay in completing the contract.

Van Horn then brought a breach-of-contract claim against Capps. Capps counterclaimed for breach of contract, essentially alleging that Van Horn breached the

contract by refusing to issue a change order for the change in fill material. After a hearing, the circuit court found that Capps breached the contract by "failing to perform the work in accordance with the plans and specifications and ultimately refused to complete its contract." It also determined that all prior negotiations and proposals of Capps merged into the subcontract. The court noted that the cost to Van Horn to complete the work was $222,352, giving Capps credit for the remaining contract balance for work not performed by Capps. Finally, the circuit court found that Capps's failure to perform the work delayed the project, causing Van Horn to incur damages pursuant to Van Horn's contract with the city of Searcy. Van Horn negotiated the liquidated-damages amount it would have owed the city for the delay from $141,000 ($1,000 per day of delay) to $96,541.94 (the cost of the excess onsite engineering services paid by the city due to the delay). The court allocated $23,280 of the $96,541.94 to Capps for a total award of damages of $245,632.

In order to prove a breach–of–contract claim, one must prove "the existence of an agreement, breach of the agreement, and resulting damages." *Schwyhart v. J.B. Hunt, LLC*, 2014 Ark. App. 324, at 11, 436 S.W.3d 173, 180. In civil bench trials, the standard of review on appeal is not whether there is substantial evidence to support the findings of the court, but whether the court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Select Concrete Co. v. Cane Creek Concrete Servs., Inc.*, 2014 Ark. App. 161, at 4. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *Id.* Where the issue is one of law, our review is de novo. *Id.*

For its first point on appeal, Capps contends that the circuit court clearly erred in finding that it breached the subcontract. Capps argues that the facts demonstrate that it could not perform the job as promised with the fill material it was using. Capps argues that, due to the wet weather, it was not the best time to make lifts with shale, that the contract was silent regarding the material to be used, and that Van Horn knew it was not possible to comply with the terms of the subcontract using the material Capps had. Capps also argues that Van Horn "committed fraud in the procurement of the subcontract."

First, Capps did not plead or argue fraud in the procurement to the circuit court, and we will not consider an argument that was raised for the first time on appeal. *Davis v. Davis*, 2013 Ark. App. 180, at 5. Capps's additional arguments merely reargue facts regarding the insufficiency of the fill material that it had in its borrow pit and that Van Horn led it to believe would be acceptable. Contrary to Keith's testimony and Capps's argument, the circuit court believed the testimony of Van Horn's witnesses that Keith was provided the plans and specifications before he signed the contract. Disputed facts and determinations of credibility are within the province of the fact-finder. *Bryant v. Osborn*, 2014 Ark. 143, at 2. In any case, although the specifications provided that class 7 material was required (shale was not a class 7 material), Capps was ultimately allowed to use its shale material in spite of the contract's requirements otherwise. The specifications also clearly provided guidelines about the lifts. After our review of the evidence, we are not left with the definite and firm conviction that a mistake was committed. *City of Jacksonville v. Nixon*, 2014 Ark. App. 485, at 3, ___ S.W.3d ___, ___.

6

SLIP OPINION

For its second point on appeal, Capps argues that the circuit court erred in awarding Van Horn a judgment in excess of "actual reasonable damages." Specifically, Capps contends that the amount Van Horn spent to complete the dirt work was over two-and-a-half times higher than the total amount to be paid to Capps for the same work. Capps then claims that, although the cost to pay other contractors should have been higher, it should not have been that much higher.

The measure of damages in this case is the amount Van Horn incurred to complete the work less the amount it would have paid Capps if no breach had occurred. *MDH Builders, Inc. v. Nabholz Constr. Corp.*, 70 Ark. App. 284, 292, 17 S.W.3d 97, 102 (2000). Van Horn submitted an itemized spreadsheet detailing the breakdown of costs it incurred to complete the dirt work. Mr. Hurley testified for Van Horn that most of the contractors it called to help complete the project did not want to get involved in the middle of a project that was already underway and therefore that Van Horn had to do some of the work itself. In order to do this, Van Horn had to rent equipment, purchase material (which it did not have in a borrow pit as did Capps), and use its own employees, who were not "the best people at doing dirt work, so then it probably cost a little bit more." He also testified that the contractors who agreed to help charged more based on time and material than they would have charged if they had contracted to perform the whole job from the start. Capps did not present any testimony or evidence demonstrating that these expenses were excessive. We hold that the circuit court's damages award was not clearly erroneous.

Affirmed.

WALMSLEY and HARRISON, JJ., agree.

*Lightle, Raney, Streit & Streit, LLP*, by: *Donald P. Raney*, for appellant.
*Williams & Anderson PLC*, by: *David M. Powell* and *Alec Gaines*, for appellee.