Cite as 2020 Ark. App. 194

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-19-489

|  |  |
|---|---|
| SUMMERS DRILLING & BLASTING, INC., A/K/A SUMMERS DRILLING, INC. <br><br> APPELLANT <br><br> V. <br><br> GOODWIN & GOODWIN, INC. <br> APPELLEE | **Opinion Delivered:** March 18, 2020 <br><br> APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT <br> [NO. 66FCV-17-696] <br><br> HONORABLE J. MICHAEL FITZHUGH, JUDGE <br><br> AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

**PHILLIP T. WHITEAKER, Judge**

The appellant Summers Drilling & Blasting, Inc. (SD&B), a subcontractor, was sued by the appellee Goodwin & Goodwin Inc. (Goodwin), a general contractor, under the theory of breach of contract. The Sebastian County Circuit Court found that SD&B had breached the parties' subcontract by failing to perform its work in accordance with the contract's plans and specifications and ultimately by refusing to complete the contract. The court awarded Goodwin $132,792.26 in damages, plus costs and attorney's fees. On appeal, SD&B argues (1) that Goodwin's claims sound in tort, not in contract; (2) that even if Goodwin's claims were properly pled as a contract action, Goodwin failed to prove a breach of that contract; and (3) that the court's award of damages was not supported by

the evidence presented. We disagree with SD&B's first two arguments on appeal but agree that a remand is necessary for a recalculation of damages.

I. *Facts and Procedural History*

Goodwin is a general contractor employed by the Arkansas Highway and Transportation Department (AHTD) and the City of Fayetteville to assist in the Porter Road–Highway 112/71B Widening and Interchange Project ("the Project") in Fayetteville, Arkansas. In December 2016, Goodwin obtained and accepted a bid from SD&B in which SD&B agreed to drill and blast rock along a designated route of the Project for the relocation of an existing sewer line, and Goodwin agreed to pay SD&B $181 per blasted foot with a 1,350-foot minimum.

SD&B began work on the project. After having completed 1,204 linear feet of work, it sent Goodwin an invoice requesting $217,924 for services rendered. Goodwin paid $185,235.40, or 85 percent of the invoice less a 15 percent retainage. Approximately halfway through the project, Goodwin discovered that certain areas blasted by SD&B were not as deep as required. As a result, Goodwin rented equipment and employed crews to hammer to the required depth, resulting in a delay of the project. SD&B subsequently removed its equipment from the job site.[1] At the time of withdrawal, SD&B had submitted two other invoices in the amounts of $28,598 for 158 linear feet, and $32,761 for 181 linear feet. Goodwin did not pay these two invoices. In total, SD&B invoiced Goodwin

---

[1]When SD&B withdrew from the project, it had blasted 1,540 feet, but the project plans specified relocation of approximately 1,650 linear feet of sewer line.

$279,283 for the work completed, but Goodwin paid only $185,235.40, or 85 percent of the original invoice.

In July 2017, Goodwin filed suit against SD&B for breach of contract. Goodwin alleged that SD&B had breached its contract by failing to blast to the depths specified by the Project plans and in failing to complete the work. SD&B denied any breach, contending that the written contract specified only a minimum distance to be blasted–1,350 feet–and made no mention of a required depth. Because it had blasted the minimum distance specified in the bid and because drilling to a required depth was not an express term of the contract, SD&B claimed that there could be no breach.

The parties presented their dispute to the court at a bench trial. The circuit court was presented conflicting positions and evidence concerning the terms of the agreement between the parties and the performance of the parties pursuant to the terms of the agreement. Goodwin took the position and presented evidence that its contract with SD&B required performance under the terms and specifications of the Project plans that Goodwin had with AHTD and the City of Fayetteville; that those Project plans detailed the depth at which the sewer pipes were to be positioned; and that SD&B failed to meet the depth specifications of the Project plans. SD&B took the position and presented evidence that its bid constituted the written contract between the parties and that this written contract was silent as to required depths. SD&B also contended that Goodwin never provided the depth specifications of the Project plans and had not provided a suitable

4

blasting site in that there was an unacceptable amount of overburden[2] hindering its ability to effectively blast. Goodwin disagreed and presented evidence that it had provided the Project plans to SD&B and contended that SD&B had specified in the agreement that the naturally occurring overburden should remain in place in order to prevent flooding of the ditches.

After hearing all the evidence and reviewing the documents provided, the court made specific findings concerning the parties' agreement: (1) the parties had entered into a contract; (2) the contract obligated SD&B to blast rock to grade; and (3) SD&B breached the contract by not blasting to the required depths under the contract and had left the job prior to completion. Concerning overburden, the court found that while there was some dispute as to the removal of overburden, Goodwin had performed as required under the contract. Concerning damages, the court found Goodwin was damaged as a result of SD&B's breach. The court calculated damages equal to the amount Goodwin incurred to complete the project less the amount it would have paid SD&B if the contract had been performed without breach, awarding Goodwin $132,792.26 in damages. SD&B appeals.

II. *Standard of Review*

SD&B appeals the judgment of damages from a breach-of-contract cause of action entered after a bench trial. In appeals from civil bench trials, our standard of review on appeal is not whether there is substantial evidence to support the findings of the court but

---

[2]The term "overburden" is used to describe soil and ancillary material above the bedrock in a given area.

5

whether the court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Barnes v. Wagoner*, 2019 Ark. App. 174, at 3, 573 S.W.3d 594, 595–96. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been made. *Id.* Where the issue is one of law, our review is de novo. *Id.*

III. *Analysis*

A. Negligence v. Breach of Contract

In its first point on appeal, SD&B argues that Goodwin's cause of action actually sounds in negligence rather than in contract and that Goodwin failed to plead or prove a negligence claim. Essentially, SD&B argues that Goodwin's challenge is to the sufficiency of its performance under the contract and not to the breach of any specific provision of the contract. SD&B then concludes that because it did not breach a specific provision of the contract, the judgment against SD&B should be reversed, along with the court's award of attorney's fees, which are available only in breach-of-contract actions.

We begin analyzing SD&B's argument by noting that the question of whether a cause of action sounds in tort or in contract usually arises in the context of either determining the appropriate application of the statute of limitations or in the award of attorney's fees. In reviewing the circuit court's analysis as it relates to its characterization of the nature of the claim, we look to the facts alleged in the complaint to ascertain the area of the law in which it sounds. *See Sturgis v. Skokos*, 335 Ark. 41, 48, 977 S.W.2d 217, 220 (1998); *McQuay v. Guntharp*, 331 Ark. 466, 470, 963 S.W.2d 583, 584 (1998).

In order to prove a breach-of-contract claim, one must prove "the existence of an agreement, breach of the agreement, and resulting damages." *Barnes*, 2019 Ark. App. 174, at 3, 573 S.W.3d at 595. As a result, Goodwin needed to file a complaint that asserted the existence of a valid and enforceable contract between the parties, the obligation of SD&B thereunder, a violation by SD&B, and damages resulting to Goodwin from the

7

breach. *Rabalaias v. Barnett*, 284 Ark. 527, 528–29, 683 S.W.2d 919, 921 (1985). When the complaint contains a claim for breach of contract, the question is whether there is a specific promise that transforms the gist of the action from one for negligence into one for breach of the written agreement. *Sturgis*, 335 Ark. at 49, 977 S.W.2d at 221.

In its complaint, Goodwin alleged that it contracted with SD&B to "remove rock along a course prescribed by AHTD and City of Fayetteville plans relative to a project identified as AHTD Job # BB0414, being more completely discharged as 'Porter Road – Highway 112/71B Widening and Interchange Water and Service Relocation, *in accordance with specifications therefor*, and to do so at a price of $181.00 per foot." (Emphasis added.) Goodwin further alleged that without legal justification, SD&B pulled its equipment from the job and abandoned the contract without completing it and that SD&B had not blasted the rock to depths specified by AHTD and the City of Fayetteville. Finally, Goodwin alleged that these breaches caused a delay in the project and additional expenditures. These allegations do not merely allege deficient performance under the contract; instead, they allege the failure to perform as required under the provisions of the parties' agreement regarding the relocation of sewer lines as set forth in the Project documents. These allegations clearly sound in contract and not in tort.

## B. Breach

SD&B next asserts that even if Goodwin's claim sounds in contract, the evidence did not support the circuit court's finding of a breach. First, SD&B posits that the court erred in finding that it was obligated to blast to certain depths. Second, SD&B posits that

the court erred in finding that it was obligated to blast for designated distances. We will address these two arguments separately.

Regarding depth requirements, SD&B asserts that its contract with Goodwin was unambiguous and did not contain any requirement for it to blast to any particular depth. Therefore, Goodwin failed to prove a breach of contract.

As noted above, our standard of review on appeal is not whether there is substantial evidence to support the findings of the court but whether the court's findings were clearly erroneous or clearly against the preponderance of the evidence. The circuit court's findings in this case were not clearly erroneous.

SD&B submitted a written bid for the blasting work, which specifically referenced the Project number at issue. The Project had certain specifications regarding the relocation of the sewer lines, including the depth at which those lines must be placed. Goodwin accepted the bid. While the bid itself was silent as to the depth to be drilled/blasted, this silence is of no moment because parol evidence is admissible if it tends to prove a part of the contract about which the written contract is silent. *Gawenis v. Alta Res., LLC*, 2013 Ark. App. 379, at 3.

Here, Goodwin presented evidence that the plans for the Project were made available to SD&B prior to bidding. Floyd Summers, the proprietor of SD&B, denied having seen the Project plans prior to submitting his bid. He did, however, admit visiting the work site prior to submitting the bid and was aware that the Project required the area to be blasted to "pre-established depths" or "grade," plus approximately six inches deeper

9

for the pipe. Thus, the court did not erroneously consider the Project depth specifications in analyzing Goodwin's breach-of-contract claim.

Next, SD&B argues that, even assuming it was required by the contract to attain the depths alleged by Goodwin, it presented to the court a drilling summary indicating that it had attained the correct depths. Admittedly, SD&B did present the court with this evidence. The court, however, heard other evidence, including testimony from Gary Jones, Goodwin's construction foreman on the project. He testified that certain areas were not "shot to grade" and that Goodwin was forced to hammer to reach the requisite depth. Even Floyd Summers testified that by early February, he knew Goodwin was hammering where his crew had been blasting because SD&B had not reached grade.

We acknowledge that SD&B attempts to place the blame for its failure to reach grade on Goodwin's failure to remove the overburden. SD&B presented testimony that under the contract, Goodwin had an obligation to maintain the site for blasting by removing the appropriate amount of overburden retained in the trench and that Goodwin failed to meet this obligation. The court acknowledged that the facts regarding the removal of the overburden were disputed and found that Goodwin had performed as required. This was a question of fact for the court to decide. *Roach v. Whitehead*, 2019 Ark. App. 525, at 4, 588 S.W.3d 841, 844 (It is within the sole province of the fact-finder to weigh credibility and resolve disputed facts.). Thus, we find no error in the court's conclusion that SD&B breached the depth requirements of the contract.

10

Regarding distance requirements, SD&B's argument is difficult to follow. In its brief, SD&B states: "At trial, Goodwin argued that Summers Drilling breached the Contract by not blasting deep enough or *for a long enough distance* (stating the linear course was a total of 1,636 feet). *The circuit court agreed*, and in doing so, disregarded both the law and the evidence." (Emphasis added.) SD&B then proceeds to argue that the contract provided that the price for ditch-line blasting would be $181 per linear foot and noted that the quoted price was based on a 1,350-foot minimum. Because it blasted more than the 1,350 feet, SD&B contends that it did not breach the contract by failing to blast "1,636 feet." It appears that SD&B is arguing that the court found it in breach of contract for failing to blast a total of 1,636 feet. This is incorrect. The court never made this finding. The court did find that SD&B "left the job prior to completion." SD&B does not challenge this specific finding of the court; rather, it conflates the court's finding with a distance requirement. Because SD&B does not challenge the court's specific finding that it left the job prior to completion, we cannot conclude that the circuit court clearly erred in this finding.

## C. Damages

SD&B's final argument is that the circuit court erred in the calculation of damages. While we agree with the circuit court's method of measuring damages, we conclude that it erred in its actual calculations.

The circuit court found that the proper measure of damages for breach of the construction contract was the amount Goodwin incurred to complete the work less the

amount it would have paid to SD&B if no breach had occurred. We agree. *See Keith Capps Landscaping & Excavation, Inc. v. Van Horn Constr., Inc.*, 2014 Ark. App. 638, 448 S.W.3d 207; *MDH Builders, Inc. v. Nabholz Constr. Corp.*, 70 Ark. App. 284, 292, 17 S.W.3d 97, 102 (2000). Utilizing this measure of damages, the circuit court found that Goodwin spent $432,008.26 to complete the job and that under the contract, it owed SD&B $299,216.01. The court then awarded Goodwin the difference between the two amounts as damages.

After having reviewed the record before us, we cannot determine how the circuit court calculated the $432,008.26 amount it specified that Goodwin incurred to complete the project. We acknowledge that this figure was cited by Goodwin's counsel in its posttrial brief—a fact referenced by the circuit court in its award of damages—but neither the posttrial brief nor the court's order refers to any specific evidence introduced at trial to explain how such a figure was calculated. The record before us contains conflicting evidence as to amounts incurred in completion of the project, and we have been unable to recreate the court's finding under any scenario supported by the evidence in the record. Because it is not entirely clear that the amount the circuit court used in calculating damages was based on the evidence presented and not simply on the arguments of counsel, we reverse and remand for a recalculation of the damages award.

Affirmed in part; reversed and remanded in part.

MURPHY, J., agrees.

HIXSON, J., concurs.

KENNETH S. HIXSON, Judge, concurring. There are different methods to calculate damages for breach of contract in these types of cases. Regardless of the method utilized, the goal is to place the injured party in the same position as if the contract had not been breached. *Spann v. Lovett & Co., Ltd.*, 2012 Ark. App. 107, 389 S.W.3d 77; *Singleton v. Williams*, 2013 Ark. App. 226. The goal is not to place the injured party in a better financial position than it would have been in had the contract not been breached. In reviewing the evidence in the record, we cannot validate or corroborate the various expenses requested by appellee, nor can we replicate the damages awarded by the court. Hence, we have remanded the issue of calculation of damages to the circuit court. I concur with the majority opinion that the calculation of damages must be remanded; however, I write separately to point out several issues that frustrate our review of the circuit court's damages calculations that must be considered on remand.

First, we must at least have an elementary understanding of the performance of the contract herein and the relative players. The City of Fayetteville (the City) was improving the interstate exchange at the Porter Road exit. A part of the project required the City to relocate or improve the sewer lines located within the project area. As such, a new ditch had to be located and excavated to a sufficient depth to allow for the flow of the new sewer line. The location of the new ditch and the depth of the new ditch were set forth in the construction plans. The topography of the project area and the new ditch required blasting and excavation of the subsurface limestone. Garver Engineering (Garver) was hired to provide engineering services and to inspect the project. Goodwin & Goodwin,

Inc. (Goodwin), was hired as the general contractor for the project. And, Goodwin subcontracted with Summers Drilling & Blasting, Inc. (Summers), to perform the drilling and blasting for the new ditch. Goodwin, as the general contractor and per its contracts with the City and Summers, was required, inter alia, to excavate the broken rock and materials and transport it from the new ditch so that the new sewer pipes could be lowered therein.

One of the Garver's engineering and inspection responsibilities was to daily document in writing the equipment located on-site, the equipment actually used, and a summary of the work performed. Garver was a representative of neither Goodwin nor Summers; rather, it operated more as a liaison back to the City. These daily reports titled "Garver Daily Reports of Construction" (Garver Daily Report) were introduced into evidence. These Garver Daily Reports commenced on December 19, 2016, and continued through May 25, 2017, when the Garver Daily Report concluded, "This completes all of the gravity sewer line installation." The Garver Daily Reports either described the actual work performed that day or, if no work was performed due to inclement weather, included a description, such as "[n]o work today due to rainfall."

The Garver Daily Report for the first day of the project, December 19, 2016, describes Goodwin personnel on-site as well as Goodwin's equipment on-site. The Garver Daily Report indicates that Goodwin had three superintendents/foremen along with eight crew members. As it relates to the issues in this litigation, the Garver Daily Report indicates that Goodwin had the following pieces of heavy equipment on-site: six trackhoes,

14

two backhoes, one loader, one dump truck, and one power broom. Although Goodwin commenced the project on December 19, 2016, according to the Garver Daily Reports, the first date that Summers appeared on-site was December 27, 2016. The Garver Daily Reports indicate that while Summers was drilling and blasting over the next few months, Goodwin was performing other tasks on the project.

This project can be generally described as involving approximately 1,650 linear feet of sewer line with fourteen manholes located along the line. When referring to a portion of the sewer line, the Garver Daily Reports and most of the testimony of witnesses refer to the area on either side of the fourteen manholes. The first indication that something was amiss with the drilling and blasting was in late January. The exact date was not noted. In late January, Gary Jones, Goodwin's foreman, advised Nick Palmer, Summers's foreman, that the rock was not being drilled and blasted deeply enough at manhole 6. The unblasted limestone was generally one to two feet thick. When the rock is not drilled and blasted to the proper depth required by the construction plans, the limestone is not broken and cannot be removed or excavated. Therefore, someone has to use a "hammer" to break up the rock. The hammer is generally an attachment to the boom of a trackhoe or excavator. The excavator pounds the hammer into the solid rock at the bottom of the ditch and breaks up the rock so it can be excavated and transported away.

During the conversation between Gary Jones of Goodwin and Nick Palmer of Summers, Jones advised Palmer that the bottom of the ditch had to be hammered out. Jones offered that Goodwin would do the hammering for $300 per hour. Palmer replied

that Summers could do the hammering for $165 per hour.  The record is unrefuted that Goodwin did not wait for Summers to commence hammering and that Goodwin commenced hammering immediately.  It also appears from the record that Summers's drilling and blasting remained too shallow for much of the remaining length of the sewer line and that Goodwin hammered out the bottom of the ditch consistently between Manholes 6 and 14.  Summers did not provide any hammering services.

Having agreed with the majority opinion that Summers breached the contract, that brings me to the issue of calculation of damages for the breach.  We disagree on the amount of damages sustained by the proof.  Goodwin introduced exhibit 13 at trial, which was the following itemized list of expenses Goodwin claimed was caused by the breach.  There is no doubt that the circuit court used the content of exhibit 13 in its calculation of damages.

64 days rental/rental rates equipment
2 months, 1 week and 1 day is how it is charged

Komatsu 650 Excavator $37,558.88
$15,365/mo, $5,121.66/wk, $1,707.21/day

Terex TA40 40 ton Offroad Articulated Dump Truck $33,802.98
$13,828.50/mo, $4,609.49/wk, $1,536.49/day

Peterbilt Quad Axle dump truck $22,776.76
$9,317.77/mo, $3,105.92/wk, $1,035.30/day

5 man Crew with truck driver included $135/hr @ 291 hrs = $39,285

Hammering rock @ $300/hr x 291 hrs = $87,300
Using Kobelco Sk295 Excavator with Kent QT 45 Hammer

16

50 days rental rates
2 month Rental
Sany SRC 840 Rough Terrain 40 ton Crane $15,255.24
$7,627.62/mo

Crane Crew $42/hr @ 231 hrs = $9,702

In summary, Goodwin first asserted that it took Goodwin 64 additional days to hammer the rock. Accordingly, Goodwin claimed that it was entitled to 64 days of rent for a Komatsu 650 Excavator, a Terex TA40 40-ton Offroad Articulated dump truck, and a Peterbilt Quad-Axle dump truck. Further, it claimed that it was entitled to 50 days of rent for a Sany SRC 840 Rough Terrain 40-ton crane, 231 hours of a crane crew, and another 291 hours of a five-man crew with a dump-truck driver. Finally, in addition to all those expenses, Goodwin claimed that it was entitled to $300 per hour for 291 hours for actually hammering the rock. These expenses totaled $245,680.86. I will now address what I perceive as the inadequacies and errors in Goodwin's calculation of alleged damages that may well be repeated on remand.

I. *Is Goodwin Entitled to any Damages other than the $300 per Hour Multiplied by 291 Hours?*

When the breach occurred, Goodwin offered to perform the hammering for $300 per hour, and Goodwin performed that offer. Goodwin did not offer to hammer for $300 per hour plus expenses. Is this important? Yes. Summers said it could hammer the rock for $165 per hour, which is a $135-per-hour difference, or $29,285. Was that a factor in Summers' decision to allow Goodwin to perform the hammering? Goodwin apparently thought so. In its response brief on appeal, Goodwin argued that the difference of this

17

hourly rate was a factor in Summers' decision.  It specifically stated that "Summers evidently believed, on balance, that it was cheaper to make Goodwin hammer at $300 an hour than to do it itself."  However, contrary to its own offer to hammer at $300 an hour, Goodwin now argues that it is somehow entitled to the $300 an hour amount *plus* an additional $158,389 for leasing equipment.[1]  That is not the same offer it made to Summers, and Goodwin should not be able to vary the terms of its agreement and recoup additional expenses for leasing equipment.

II.  *Even assuming Goodwin is Entitled to Recoup Additional Expenses for Leasing Equipment, Does the Evidence support the Expenses claimed on Exhibit 13?*

A.  The 64 Days and the Hours Hammering

The "hammering" records maintained by Goodwin are reflected in handwritten notes kept by its foreman, Gary Jones.  Jones testified that during the early period of hammering, he failed to make contemporaneous notes, and when he prepared the "Goodwin Hammering Summary" for trial, he relied on his memory.  Jones admitted that some of his entries could be inaccurate.  According to the Goodwin Hammering Summary, the daily hammering times range from "0.5" hours to "14" hours.  The Goodwin Hammering Summary concluded that Goodwin hammered on 64 separate days and actually hammered for 291[2] hours.  Goodwin contends that because it hammered during a

---

[1]I disagree with the statement in the majority opinion that, "Goodwin rented equipment and employed crews to hammer to the required depth, resulting in a delay of the project."

[2]The Goodwin Hammering summary reflects a total of 294.5 hours and exhibit 13 used by Goodwin to calculate damages reflects 291 hours.

portion of 64 separate days, it is entitled to damages for additional equipment-lease expenses as set forth below. Also, Goodwin contends in exhibit 13 that it is entitled to damages for 291 hours of actual hammering at $300 an hour.

On the other hand, to calculate the actual hours hammered by Goodwin, Summers relies on the independent Garver Daily Reports. Those Garver Daily Reports only specifically reflect Goodwin hammering on 34 partial days—not 64 days. Summers then argues that by adding up the actual hours hammered on those 34 days, the total hours actually hammered were 218.5 hours and not 291 hours. Obviously, the resolution of these records and the testimony will be central to the calculation of damages on remand.

## B. The Komatsu 650 Excavator

Goodwin alleges it is entitled to 64 days of rent for the Komatsu 650 Excavator totaling $37,558.88. One must presume that this is the excavator that was actually used to hammer the rock. The Garver Daily Reports show that Goodwin had four excavators on-site from the first day of construction. It appears that this Komatsu excavator was one of those four excavators on-site because Goodwin introduced the invoices for this very excavator at trial. Goodwin leased this Komatsu excavator in October, November, and December 2016, almost three months before this project began on December 26. Then, this Komatsu excavator plus three other excavators/trackhoes remained on-site for the full project period. There is no evidence in the record that Goodwin paid any additional rent for this Komatsu excavator because it was used for hammering. However, there are additional issues with this calculation of damages. Even assuming Goodwin did pay

19

additional rent, Goodwin was charged a much lower monthly rent by the lessor and not the much higher daily rent allegedly expended by Goodwin. Any way you cut it, the expense of $37,588.88 requested by Goodwin for the Komatsu excavator and used by the circuit court to award damages is not supported by the evidence.

### C. The Terex TA40 40-Ton Offroad Articulated Dump Truck and the Peterbilt Quad Axle Dump Truck

The same date and value discrepancies for the Komatsu excavator are true for the Terex TA40 40-ton Offroad Articulated Dump Truck and the Peterbilt Quad Axle Dump Truck; plus, there is an additional error. Goodwin was required by its contract to excavate and remove the rock and debris. This would be true whether the excavated material was caused by blasting or by hammering. Summers's job was to drill and blast; Goodwin's job was to excavate and transport the debris. In my opinion, Goodwin is not entitled to any damages for the excavation of the hammered material.

### D. The Sany SRC 840 Rough Terrain 40-Ton Crane and Crane Crew

Goodwin wants to recover damages for rent for using a crane for 50 days totaling $15,255.24 and employment of a crane crew for 231 hours totaling another $9,702. However, when one reviews the Garver Daily Reports, the crane was on-site for only 25 days of the project and used only 13 of those days—not the 50 days demanded. Again, the evidence does not support the judgment.

20

### E. The Five-Man Crew with Truck Driver Included

Goodwin additionally wants to recover damages for employment of a five-man crew for a dump truck totaling $39,285. However, there is not any foundation for this request. Further, if one agrees with the contention that Goodwin had to excavate and remove the material whether it was blasted or hammered, Goodwin should not receive any award for this element of damages. Again, the evidence does not support the judgment.

### III. *Is Summers Entitled to Offset any Damages with the Unpaid Invoices?*

My last point is that regardless of the methodology used to calculate damages, Summers is certainly entitled to a credit or an offset for the unpaid balance of its work. Summers submitted three invoices to Goodwin for its work: one for $217,924; a second for $28,598; and a third for $32,761. Although these invoices totaled $279,283, it is undisputed that Goodwin paid only $185,235.40, leaving $94,047.60 unpaid. Goodwin certainly benefited from this unpaid portion of drilling and blasting, and this unpaid balance must be incorporated into the calculation.

### IV. *Conclusion*

In conclusion, I join the majority in its determination that the damages awarded by the circuit court are not supported by the evidence and the damages-calculation issue must be remanded. The goal is to place the injured party in the same position as if the contract had not been breached—not to provide a windfall. Thus, I write this concurrence to illuminate other issues that should be considered on remand.

*RMP LLP*, by: *Larry McCredy* and *Bo Renner*, for appellant.

*Smith, Cohen & Horan, PLC*, by: *Matthew T. Horan*, for appellee.